**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 98-10020
_____

MICHAEL NERO,

Plaintiff-Appellee,

versus

INDUSTRIAL MOLDING CORPORATION,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

March 2, 1999

Before EMILIO M. GARZA, BENAVIDES, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant-Appellant, Industrial Molding Corporation ("IMC"), appeals from a judgment entered on a jury verdict holding IMC liable to Plaintiff-Appellee, Michael Nero, for violations of the Family and Medical Leave Act of 1993 ("FMLA") and the Employee Retirement Income Security Act of 1974 ("ERISA"). IMC alleges that (1) Nero presented insufficient evidence to prove that Nero's medical leave under the FMLA caused his termination; (2) the evidence did not establish that Nero's claim to medical benefits under ERISA caused his termination; (3) the district

court erred in awarding liquidated damages under the FMLA; and (4) the FMLA and ERISA do not entitle Nero to out-of-pocket expenses or mental anguish damages. We reverse the district court's ruling on the out-of-pocket expenses and mental anguish damages, and affirm as to all other rulings.

I

Michael Nero worked as an interim plant manager for IMC, a plastics molding company in Lubbock, Texas. IMC had hired Dean Hall to review and to restructure the manufacturing department, and Hall testified that he determined that Nero was not the right person for plant manager. Dean Hall conferred with supervisory personnel Harker Collins, IMC's Executive Vice President, and Mary Pierce, IMC's Vice President of Human Resources. Hall, Collins, and Pierce testified that by May 25, 1995, they had decided to terminate Nero, effective May 31, due to substandard management practices and the department restructuring. Amy Willingham and Jess Truelock, employees in the Human Resources department, testified that Nero's termination package, which included the standard severance pay, had been completed by May 26. IMC selected Andy Wilson to replace Nero as plant manager, effective June 1.

Before IMC notified Nero of his termination, Nero suffered a heart attack on May 29. After open heart surgery, Nero remained in the hospital for nine days. Due to the heart attack, supervisory personnel postponed telling Nero of his May 31 termination, deciding instead to notify Nero upon his return from his leave of absence. Upon his return in mid-July, IMC offered Nero the option either to retain employment as a shift supervisor and receive half the plant manager salary, or to work as a shift supervisor for ninety days while looking for other employment and receive the full plant manager salary. Nero could not make a choice and

returned home. Pierce called later to tell him that IMC would offer a third option of terminating his employment immediately, with two months severance pay. Nero received all options in writing, and ultimately chose to terminate his employment immediately.

Nero filed a suit in federal court, alleging that his termination violated the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), the FMLA, and ERISA. *See* 29 U.S.C. § 626(c) (ADEA); *id.* § 1132(a) (ERISA); *id.* § 2617(a)(2) (FMLA); 42 U.S.C. § 12117(a) (ADA). He alleged that IMC's decision to terminate him did not occur prior to his heart attack, but rather occurred because of the heart attack and the claimed medical benefits. Prior to the heart attack, he had received "up to expectations" ratings on his weekly performance evaluations. Nero insisted that a discrepancy in a termination document proved the termination decision occurred after the heart attack. He contends that the inclusion of one of the employment options on the "payroll status change form" proves that IMC doctored the document and that IMC's reasons for termination are a pretext. The document, which IMC prepared allegedly on May 26, includes the option of two months severance pay. Nero insists this option was not considered until his termination in July.

At the conclusion of Nero's case, IMC moved for judgment as a matter of law, and the court denied the motion. IMC renewed the motion before the case was submitted to the jury. The court again denied the motion. After deliberation, the jury returned a verdict against Nero on the ADEA and ADA claims, and in favor of him on the FMLA and ERISA claims. The jury found that the decision to terminate Nero did not take place prior to May 29, that IMC violated the FMLA in its dealings with Nero, and that the claimed employee medical benefits were a cause

of his termination.[1]  The jury awarded Nero $41,439.00 in past lost wages and employee benefits,

$11,000.00 in mental anguish damages, and $5,166.00 in out-of-pocket expenses.  IMC moved

for judgment as a matter of law, which the district court denied.  Upon Nero's motion, the district

court entered judgment in the amount of $119,661.20, which included liquidated damages,[2]

together with attorney's fees of $27,025.34.  IMC appeals from the judgment.

## II

IMC appeals from the district court's denial of its motion under Federal Rule of Civil

Procedure 50(a) for Judgment as a Matter of Law.  IMC argues the court should have granted its

motion because there was insufficient evidence that IMC violated the FMLA or that it terminated

Nero due to his claim to medical benefits under ERISA.  We review a Motion for Judgment as a

Matter of Law *de novo*, and apply the same legal standard as the trial court.  *See Omnitech Int'l,*

---

[1]  After deliberation, the jury returned the following verdict:
Question 1: Did defendant discriminate against plaintiff in terminating him from his job because of his age?  Answer: No.
Question 3: Do you find that the decision to terminate the plaintiff occurred prior to May 29, 1995?  Answer: No.
Question 4: Was plaintiff, at the time of his termination, an individual that was regarded by the defendant as having a physical or mental impairment that substantially limited a major life activity?  Answer: No.
Question 8: Was defendant's decision to terminate plaintiff motivated by an intent to interfere with plaintiff's employee benefit plan rights?  Answer: Yes.
Question 9: Do you find that defendant failed to comply with the Family and Medical Leave Act in its dealings with the plaintiff?  Answer: Yes.
Question 10: Do you find that defendant lacked good faith in its dealings with the plaintiff under the Family and Medical Leave Act?  Answer: Yes.

[2]  Under the FMLA, a plaintiff may recover (i) damages due to lost compensation, (ii) interest on that amount, and (iii) liquidated damages equal to (i) and (ii).  *See* 29 U.S.C. 2617(a)(1).  This effectively doubles the size of the award.  IMC's liquidated damages equaled $51,747.60.  The judge derived this amount by adding $41,439.00 in damages to $10,308.60 in interest.  The interest was compounded annually from the date of Nero's termination, at a rate of 10%.

*Inc. v. Clorox Co.,* 11 F.3d 1316, 1322-23 (5th Cir. 1994). On a motion under Rule 50(a), we consider "all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc). Granting the motion is proper if we believe that the facts and inferences point so strongly in favor of IMC that reasonable men could not arrive at a contrary verdict. *See id.*

IMC contends that the claims under the FMLA and ERISA are subject to the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). We have stated, however, that after a case has been tried on the merits, the *McDonnell Douglas* formula is not applicable. *See Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 118 (5th Cir. 1993). Rather, we engage in "'traditional sufficiency-of-the-evidence analysis' to determine whether reasonable jurors could find discriminatory treatment." *Travis v. Board of Regents of the Univ. of Tex. Sys.,* 122 F.3d 259, 263 (5th Cir. 1997) (quoting *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (en banc)), *cert. denied*, ) ) U.S. ) ), 118 S. Ct. 1166, 140 L. Ed. 2d 176 (1998). "We focus our inquiry on whether the record contains evidence upon which a reasonable trier of fact could have concluded as the jury did." *Molnar,* 986 F.2d at 118 (citations omitted).

A

The jury found that IMC failed to comply with the FMLA in its dealings with Nero. The FMLA provides, in part, that an employee "shall be entitled, on return from [a qualified] leave — (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment

benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). The FMLA also provides that, "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken leave." 29 U.S.C. § 2614(a)(3). We consider whether the jury's finding is supported by the evidence. *See Haschmann v. Time Warner Entertainment Co.,* 151 F.3d 591, 604 (7th Cir. 1998) (reviewing jury verdict that defendant violated FMLA); *Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir. 1998) (same).

The thrust of IMC's argument is that Nero was not entitled to be restored as acting plant manager because IMC terminated him before the heart attack. *See Tuberville v. Personal Fin. Corp.,* No. 3:95CV150-B-A, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996) ("[W]here the wheels of termination were put in motion before the request for leave, the court finds that the restoration provision should not apply"). IMC argues that there is insufficient evidence to support the jury's verdict because there is insufficient evidence that IMC made the decision to terminate Nero after the heart attack.

The jury found that IMC did not make the decision to terminate Nero prior to the medical leave, and there is evidence to support this finding. Supervisory personnel Collins, Hall, and Pierce testified that the decision to terminate Nero occurred before his heart attack, and that IMC terminated Nero for sub-standard managerial practices and because he had trouble getting along with other employees. The weekly evaluations of Nero, however, do not document strained relations between him and other employees; Nero received ninety-two "up to expectations" ratings, only two "below expectations" ratings, and six "above expectations" ratings as a plant

manager. Additionally, Hall rated Nero "up to expectations" at Nero's last evaluation, conducted May 24, during which Hall walked through the building in a cursory fashion and talked pleasantries. Hall testified that he gave Nero an "up to expectations" rating because Hall had decided previously to terminate Nero and Hall did not wish to "make a confrontation out of it." IMC discounts the evaluations, contending that evaluations occur through personal counseling at Nero's level of management. Nero disagreed, testifying that IMC used the evaluation system from the top to the bottom of the corporation. IMC asserts that Nero's immediate supervisors counseled Nero on numerous occasions regarding his managerial style, yet it produced no documentation that these counseling sessions occurred. Willingham testified that employees are warned before they are fired. Nero testified, however, that he had no warning that he would be terminated.

The supervisory personnel cite company documents establishing that the decision to terminate Nero occurred four days before the heart attack. Nero argues that the May "payroll status change form" is suspect because it indicates he was to receive two months severance pay, however, he was not offered this option until July. IMC responds that it created the document in May before Nero's heart attack and that it included this option because it is standard for managers to receive two months severance pay. Yet, when Nero requested three months severance pay in July, Pierce told Nero that it is normal for people to get one month severance pay. Hall testified that the payroll form could have been prepared at any time, and that the documents in the May termination package are not signed because "we usually don't sign [them] until all the paperwork is done and the person is terminated."

On the basis of the evidence, a jury could reasonably believe that Nero was performing his

job properly for a number of months and that the time of IMC's termination of Nero (days after his heart attack) was not merely a coincidence. A jury also could reasonably believe that IMC's stated reasons for firing Nero—substandard management practices and department restructuring—were not the real reasons for its termination decision. Although conflicting, some evidence supports the jury's finding that the decision to terminate Nero did not occur prior to his heart attack, and therefore the FMLA entitled Nero to return to his job as plant manager.

IMC argues that there was no evidence to establish that IMC terminated Nero in retaliation for his request for leave under the FMLA. This argument reflects a misunderstanding of Nero's claim. We have explained that the FMLA contains two distinct provisions. *See Bocalbos v. National W. Life Ins. Co.,* 162 F.3d 379, 383 (5th Cir. 1998); *see also Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159-60 (1st Cir. 1998)*; Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712-13 (7th Cir. 1997). The first type of provision creates a series of entitlements or substantive rights. An employee's right to return to the same position after a qualified absence falls under this category. *See Bocalbos*, 162 F.2d at 383. An employer must honor entitlements, and cannot defend by arguing that it treated all employees identically. *See Diaz,* 131 F.3d at 712. "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Hodgens*, 144 F.3d at 159. The second type of provision is proscriptive, and protects employees from retaliation or discrimination for exercising their rights under the FMLA. *See id.; see also* 29 C.F.R. § 825.220(c) (1997) ( "An employer is prohibited from discriminating against employees . . . who have used FMLA leave."). Nero argued repeatedly and clarified at trial that he is "not saying he got fired because of taking the leave." Rather, Nero argued consistently throughout

trial that "the crux of the claim [is that] he wasn't restored" to his job. IMC continues to argue at length, however, against a theory that Nero repeatedly disavowed. Declining to consider further IMC's immaterial argument, we conclude that the evidence presented and the reasonable inferences from it, viewed in a light most favorable to Nero, sufficiently support the jury's verdict that IMC violated the FMLA.

B

The jury also found that an intent to interfere with Nero's employee benefit plan rights motivated IMC's decision to terminate Nero. Section 510 of ERISA provides:

> It shall be unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan] . . . .

29 U.S.C. § 1140. A plaintiff need not show that the sole reason for the termination was to interfere with rights protected by ERISA; he need only prove that a specific intent to violate ERISA partly motivated the employer. *See Olitsky v. Spencer Gifts, Inc.,* 964 F.2d 1471, 1478 (5th Cir. 1992). A plaintiff may raise the inference of discrimination by direct or circumstantial evidence. *See Stafford v. True Temper Sports,* 123 F.3d 291, 295 (5th Cir. 1997). We consider whether the evidence and the reasonable inferences from the evidence supports the jury's finding.

When IMC terminated Nero, it had a medical and hospitalization plan in effect that covered the employees. Pierce testified that IMC partially self-funded the medical insurance up to $25,000 per person per year, and that IMC's stop-loss insurance paid amounts after the first $25,000. The stop-loss insurance premiums were subject to the claims experience of IMC. Nero presented evidence that his heart attack and open heart surgery was the costliest health condition for IMC's employees for that year. Furthermore, Collins testified that if Nero would have had

additional claims after July 31, which was the beginning of the calendar year for the insurance

determination of claims, then IMC would have paid those claims, up to $25,000. Nero argues

that his medical benefits were a cause of his termination, because his benefits were costly to IMC

and because IMC fired him to avoid paying any future claims.

IMC argues, as it did with the FMLA claim, that Nero's claim to medical benefits could

not have caused the decision to terminate Nero, because that decision occurred before his heart

attack. For the reasons explained previously, there is sufficient evidence to support the jury's

finding that the decision to terminate Nero was not made prior to his heart attack. Further,

Nero's termination followed so shortly after his claim to medical benefits that the jury could

reasonably infer a retaliatory motive. *See Mathews v. Trilogy Communications, Inc.,* 143 F.3d

1160, 1166 (8th Cir. 1998) (stating causality between termination and participation in a self-

insured medical plan can be established by circumstantial evidence, "such as proof that the

discharge followed an exercise of protected rights so closely in time as to justify an inference of

retaliatory motive"); *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 881 (9th Cir. 1989) ("the

timing of a discharge may in certain situations create the inference of reprisal"); *cf. Swanson v.*

*General Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (stating that close timing between

protected activity and adverse employment action may provide "causal connection" in Title VII

case), *cert. denied*, ＿＿ U.S. ＿＿, 118 S. Ct. 366, 139 L. Ed. 2d 284 (1997). Taking all the

evidence and inferences in favor of Nero, we conclude that the evidence supports the jury's

finding that IMC violated ERISA when it terminated Nero.

### III

IMC contends that the district court erred in awarding liquidated damages under the

FMLA, because Nero presented insufficient evidence that IMC lacked good faith in its dealings with Nero. The FMLA provides that a court shall award liquidated damages equal to the damages due to lost compensation plus interest. *See* 29 U.S.C. § 2617(a)(iii). If an employer proves that it acted "in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the FMLA]," then the court may reduce the damages. *Id.*

The FMLA does not, by its terms, provide guidance as to what constitutes "good faith." IMC urges us to read the term as it is read in the Fair Labor Standards Act ("FLSA"). The statutes have similar remedial provisions—both statutes provide that an employer "shall" be liable for damages and liquidated damages, and both statutes provide that, if good faith is proven, the district court "may" reduce the amount of liquidated damages. *See* 29 U.S.C. § 216(b) (providing damages under FLSA); *id.* at § 260 (providing good faith defense to liquidated damages under FLSA); *id.* at § 2617(a) (FMLA). "[T]he legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA." *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998) (citing S.REP. No. 103-3, at 35 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA. . . . The relief provided in FMLA also parallels the provisions of the FLSA.")). Thus, the remedial provision in the FLSA can aid in interpreting the similar remedial provision in the FMLA.

Under the FLSA, a district court may not exercise its discretionary authority to reduce or to eliminate a liquidated damages award unless the employer first sustains its burden of showing that its failure to obey the statute was in good faith. *See Reich v. Tiller Helicopter Servs., Inc.*, 8

F.3d 1018, 1031 (5th Cir. 1993). Thus, we consider first whether IMC sustained its burden of proving that it acted in good faith, and we will reverse a district court's factual finding of good faith only if it is clearly erroneous.[3] *See Vega v. Gasper*, 36 F.3d 417, 427 (5th Cir. 1994) (FLSA context). If we find that IMC carried its burden, then we consider whether the district court abused its discretion in declining to reduce the damages award. *See Local 246 Utility Workers Union v. Southern Cal. Edison Co.,* 83 F.3d 292, 298 (9th Cir. 1996).

We turn to whether IMC acted in good faith. IMC alleges it acted in good faith because the decision to terminate Nero occurred before the heart attack, and the company justifiably believed that it was not required to restore Nero to his former position.[4] It alleges also that the

---

[3]    IMC argues that "Nero did not carry the burden of showing that IMC lacked good faith . . . ." The statutory language clearly indicates that it is not the employee's burden to disprove good faith. Rather, "[t]he employer has the substantial burden of proving its good faith." *Vega*, 36 F.3d at 427 (interpreting good faith defense in the FLSA).

[4]    IMC urges us to read the "good faith" requirement together with the word "willful" in the FMLA. The word "willful," however, does not appear in the "liability" section of § 2617, and IMC does not specify which statutory provision contains the word "willful." "Willful" only appears in the FMLA in the limitations provision in § 2617, and thus we assume this is the language to which IMC refers.
     The FMLA provides that the general limitations period is two years, however, "in the case of such action brought for a willful violation," the period is three years. 29 U.S.C. § 2617(c). IMC contends that the FLSA also contains these terms, and that we have adopted a "reckless disregard" standard for the definition of "willful" in the FLSA. *See Peters v. City of Shreveport,* 818 F.2d 1148, 1168 (5th Cir. 1987). Under this standard, the employer must have acted in reckless disregard of the rights of the employee, and it is not enough to show that the employer knew that the FLSA is "in the picture." *Id.* IMC urges us to adopt the "reckless disregard" standard, and IMC contends that the evidence does not show that "IMC lacked good faith or acted willfully in 'reckless disregard' of [Nero's] rights."
     We decline to incorporate a "reckless disregard" standard into the liability provision of § 2617. IMC's argument is unpersuasive because there is no indication that the word "willful" in the limitations provision has any bearing on the good faith defense in the liability provision. It is true that *Peters* adopted the "reckless disregard" standard for the word "willful" in the FLSA's limitations provision. *See Peters,* 818 F.2d at 1168 ("Applying the 'reckless disregard' standard . . . , we find that the district court did not err in refusing to apply the three-year statute of limitations."). *Peters*

-12-

provision of alternate employment opportunities to Nero evidenced good faith on the part of IMC. The jury, however, found that IMC did not prove that it acted in good faith. The jury answered affirmatively the question, "Do you find that Defendant lacked good faith in its dealings with the Plaintiff on the Family and Medical Leave Act?". In light of the discrepancy between the testimony of IMC personnel and the "payroll status change form," the jury's conclusion regarding good faith is not clearly erroneous. IMC did not meet its burden of proving that it acted in good faith, and so the district court decided correctly not to reduce the liquidated damages under § 2617(a)(iii).

Even assuming that IMC acted in good faith, the decision to award liquidated damages is still within the discretion of the trial court. We stated in the FLSA context that, "[e]ven if a trial court is satisfied that an employer acted both in good faith and reasonably, it may still award liquidated damages at its discretion in any amount up to that allowed by 29 U.S.C. § 216(b)." *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407, 1416 n.8 (5th Cir. 1990). Doubling of an award is the norm under the FMLA, because a plaintiff is awarded liquidated damages in addition to compensation lost. The district court's discretion to reduce the liquidated damages "must be exercised consistently with the strong presumption under the statute in favor of doubling." *Shea v. Galaxie Lumber & Constr. Co., Ltd.,* 152 F.3d 729, 733 (7th Cir. 1998) (discussing FLSA liquidated damages provision). Accordingly, we cannot say the district court abused it discretion in declining to reduce the damages award. *See Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir. 1998) (stating in FLSA case that, even if IBP acted in good faith, "[g]iven IBP's violation

distinguishes clearly, however, the good faith inquiry for the liquidated damages provision from the willfulness inquiry for the limitations period. *See id.* at 1166-68. Thus, we decline to read the "good faith" requirement together with the term "willful" in the FMLA.

-13-

of the FLSA, we conclude that the district court did not err in exercising its discretion to award liquidated damages.").

IV

IMC challenges the award of out-of-pocket expenses and mental anguish damages, contending that such damages are not recoverable under either the FMLA or ERISA as a matter of law. In reviewing an award of damages, we review all issues of law *de novo*. *See Rhodes v. Guiberson Oil Tools*, 82 F.3d 615, 620 (5ᵗʰ Cir. 1996).

A

We turn first to whether the FMLA supports damages for out-of-pocket expenses. The jury awarded Nero $5,166.00 in out-of-pocket expenses, which included moving and job search expenses. The FMLA provides that an employer who violates the statute shall be liable for damages equal to the amount of "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I). IMC argues that the plain language of § 2617(a)(1)(A)(i)(I) does not support damages for out-of-pocket expenses.

We consider whether out-of-pocket expenses can be characterized as "other compensation denied or lost." When interpreting a statute, we examine the statute itself and give the words of the statute their ordinary meaning. *See Moskal v. United States,* 498 U.S. 103, 108, 111 S. Ct. 461, 465, 112 L. Ed. 2d 449 (1990). Black's Law Dictionary defines "compensation" as "remuneration for services rendered, whether in salary, fees, or commissions" and, more generally, as "payment of damages." BLACK'S LAW DICTIONARY 283 (6ᵗʰ ed. 1990). These definitions suggest there is a spectrum of meanings for the term "compensation." It is unclear

-14-

which meaning should prevail, and so our constructional problem is resolved by reference to the doctrine of *noscitur a sociis*, which is the principle that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 575, 115 S. Ct. 1061, 1069, 131 L. Ed. 2d 1 (1995). This maxim of construction is used "to avoid ascribing to one word a meaning so broad that is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Id.* (citation omitted). The terms "wages, salary, and employment benefits" imply some type of *quid pro quo* exchange between the employee and employer. *See* BLACK'S LAW DICTIONARY at 1337 (defining "salary" as "[a] reward or other recompense for services performed," or "[a] stated compensation paid periodically as by the year, month, or other fixed period, in contrast to wages which are normally based on an hourly rate"); *id.* at 1579 (defining "wages" as "[a] compensation given to a hired person for his or her services"). We find that the term "other compensation," appearing as it does with the other terms, implies a *quid pro quo* exchange for services rendered. *See, e.g., Llyod v. Wyoming Valley Health Care Sys., Inc.,* 994 F.Supp. 288, 291 (M.D. Pa. 1998) (holding "other compensation" implies *quid pro quo* exchange); *McAnnally v. Wyn South Molded Prods., Inc.,* 912 F.Supp. 512, 513 (N.D. Ala. 1996) (same).

Reference to the language in § 2617(a)(1)(A)(i)(II) buttresses this interpretation of the meaning of "other compensation." This section provides that any employer shall be liable for damages equal to:

> in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation . . .

29 U.S.C. § 2617(a)(1)(A)(i)(II). If the term "other compensation" means the damages that

usually make up compensatory damages, i.e. damages to make the plaintiff whole, then this term includes all actual monetary damages. The statute, however, distinguishes "actual monetary damages" from "other compensation." This distinction suggests that "other compensation" has a narrower meaning than "actual monetary damages."

We hold that Nero's damages under § 2617(a)(1)(A)(i)(I) are limited to an amount equal to the lost salary or wages, lost employment benefits, or any "other compensation" that is indicative of a *quid pro quo* relationship between an employer and an employee. We do not believe, nor does Nero argue, that we can characterize the out-of-pocket expenses in this case as having arisen from a *quid pro quo* in the employment arrangement. Nero argues that the out-of-pocket expenses are mitigation expenses for the cost of finding another job and relocating his family. The out-of-pocket expenses are in the nature of consequential damages, and § 2617(a)(1) does not provide for recovery of general or consequential damages. *See Smith v. Office of Personnel Management*, 778 F.2d 258, 261 (5th Cir. 1985) (characterizing expenses to secure employment in another state as consequential damages). Thus, we conclude that § 2617(a)(1)(A)(i)(I) does not support an award of damages for Nero's out-of-pocket expenses.

B

We consider next whether Nero can recover damages for out-of-pocket expenses arising from IMC's violation of § 510 of ERISA. The civil enforcement provisions for ERISA violations are provided in § 502. *See* 29 U.S.C. § 1132(a). Section 502(a)(1)(B) provides that a civil action may be brought to recover benefits due or to enforce rights under the terms of an employee benefit plan. *See id.* Section 502(a)(3) provides for relief apart from an award of benefits due

-16-

under the terms of a plan. Under that section, a plaintiff may bring an action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations . . . ." *Id.* (emphasis added). Nero brought this action pursuant to § 502(a)(3).[5] IMC contends that the district court erred in awarding out-of-pocket expenses, because these expenses are extracontractual in nature and therefore are not permitted by ERISA. *See Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321, 1335 (5th Cir. 1992) ("Damages that would give a beneficiary more than he or she is entitled to receive under the strict terms of the plan are typically termed 'extracontractual.'").

We stated in *Medina v. Anthem Life Insurance Co.,* 983 F.2d 29, 30 (5th Cir. 1993), that "[t]he plain language of this statute does not mention recovery of extracontractual . . . damages." In *Medina*, we considered whether the civil enforcement provisions would nonetheless support extracontractual damages. In *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985), the Supreme Court emphasized an unwillingness to infer causes of action in the ERISA context:

> The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted, however, provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute." . . .
> . . . .
> In contrast to the repeatedly emphasized purpose to protect contractually defined benefits, there is a stark absence—in the statute itself and in its legislative history—of any reference to an intention to authorize the recovery of extracontractual damages.

---

[5] Nero does not cite a provision of the statute, or relevant caselaw, in support of these damages. His argument is that "logic dictates" that he should be compensated for these expenses. We construe his claim as a request for "other appropriate equitable relief" under § 502(a)(3).

*Russell*, 473 U.S. at 146-48, 105 S. Ct. at 3092-93 (citations omitted). The Court also noted in

*Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 52, 107 S. Ct. 1549, 1555, 95 L. Ed. 2d 39

(1987), that the text of the statute argues "strongly for the conclusion that ERISA's civil

enforcement remedies were intended to be exclusive." Based on the Court's language from

*Russell* and *Pilot Life*, we stated in *Medina* that:

> [T]he Court felt that the statutory enforcement scheme Congress crafted for ERISA in section 502(a) did not include a private remedy for extracontractual and punitive damages. Without explicit instructions from Congress, we are bound to the plain language of the statute that limits suits to the terms of the plan at issue, rather than arbitrarily extending its scope to include suits for extracontractual and punitive damages.

983 F.2d at 32-33. The reasoning in *Medina,* which supported holding extracontractual damages

unavailable under § 502(a)(1)(B), is applicable to all of § 502(a). The Supreme Court confirmed

this in *Mertens v. Hewitt Associates*, 508 U.S. 248, 255, 113 S. Ct. 2063, 2068, 124 L. Ed. 2d

161 (1993), in which it explained that awards for compensatory damages would not constitute

"other appropriate equitable relief" within the meaning of § 502(a)(3).

Based on the language of § 502(a)(3) and the decisions interpreting ERISA's civil

enforcement provisions, we agree with IMC that Nero's claim for out-of-pocket expenses is

foreclosed. *See also Zimmerman v. Sloss Equip., Inc.,* 72 F.3d 822, 829 (10th Cir. 1995)

(concluding extracontractual damages unavailable under § 502(a)(3)); *Harsch v. Eisenberg*, 956

F.2d 651, 655 (7th Cir. 1992) (§ 502(a)(1)(B)); *Reinking v. Philadelphia Am. Life Ins. Co.,* 910

F.2d 1210, 1219 (4th Cir. 1990) (§ 502(a)(1)(B)); *Sokol v. Bernstein*, 803 F.2d 532, 536 (9th Cir.

1986) (§ 502(a)(3)). Having found that the out-of-pocket expenses are not recoverable under §

502(a)(3) of ERISA, we conclude that the district court erred in awarding Nero damages for his

out-of-pocket expenses.

C

Finally, IMC argues that ERISA does not authorize mental anguish damages.[6] Nero disagrees, arguing that IMC waived its right to challenge the award of damages for mental anguish. A jury instruction, to which IMC did not object, informed the jury that it could award mental anguish damages for a violation of ERISA. Another jury question, however, asked what amount would compensate Nero for mental anguish. IMC objected to the question because "there is not any evidence of mental anguish of the nature that is sufficient to allow damages in this case." Nero contends that this objection addresses only the sufficiency of the evidence to submit a question to the jury, and does not challenge whether ERISA authorizes recovery of mental anguish damages as a matter of law.

We agree that IMC waived its argument that Nero is not entitled to mental anguish damages as a matter of law. Federal Rule of Civil Procedure 51 states:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

FED.R.CIV.P. 51. The Rule's purpose is to allow the trial court to correct any error before the jury begins it deliberation. *See Farrar v. Cain*, 756 F.2d 1148, 1150 (5th Cir. 1985). IMC did not "state[] distinctly" the nature of the error, and thus IMC cannot complain presently that mental anguish damages are not recoverable as a matter of law. *See Wood v. Diamond M. Drilling Co.*, 691 F.2d 1165, 1169 (5th Cir. 1982).

---

[6] IMC argues also that Nero is not entitled to mental anguish damages under the FMLA. The jury was instructed that it could find mental anguish damages under either ERISA or the ADA. In his motion for judgment on the jury verdict, Nero requested the damages solely under ERISA. There is no reason for IMC's argument challenging the mental anguish damages under the FLMA.

IMC waived its right to challenge the mental anguish damages, and consequently we review the award of damages for plain error.  *See Russell v. Plano Bank & Trust*, 130 F.3d 715, 721 (5th Cir. 1997).   We have explained that, in the civil context, an appellant will prevail under this standard if we find: (1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) the plain error affects substantial rights; and (4) not correcting the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings.  *See Russell*, 130 F.3d at 721.

We find that an error occurred when the district court awarded mental anguish damages and the error was plain.  Mental anguish damages are extracontractual and are not recoverable under § 502(a)(3).  *See Mertens,* 508 U.S. at 255, 113 S. Ct. at 2068; *Medina,* 983 F.2d at 32. We find that this error affects IMC's substantial rights, because IMC would not be liable for the damages absent the error.  *See United States v. Calverley*, 37 F.3d 160, 164 (5th Cir. 1994) (explaining error affects substantial rights if it affects the outcome of the proceeding).  We find that not to correct the award would result in an injustice, because the award resulted from a fundamental misapplication of the law.  Therefore, the district court plainly erred in awarding these damages.  *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S. Ct. 2748, 2754, 69 L. Ed. 2d 616 (1981) ("'Plain error' review under Rule 51 is suited to correcting obvious instances of injustice or misapplied law.").

V

For the foregoing reasons, we REVERSE the district court's ruling as to the award of damages for out-of-pocket expenses and mental anguish.  We AFFIRM the district court's ruling in all other respects.