United States Court of Appeals
Fifth Circuit

**F I L E D**

April 14, 2006

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 05-20299

KENNETH A. MAUDER,

Plaintiff-
Appellant,

versus

METROPOLITAN TRANSIT AUTHORITY OF HARRIS
COUNTY, TEXAS, also known as Metro,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Appellant Kenneth Mauder ("Mauder") appeals from the district court's grant of summary judgment in favor of the defendant-appellee Metropolitan Transit Authority of Harris County, Texas ("Metro"). Mauder states that the district court erred in its grant of summary judgment because (1) he presented sufficient evidence that he suffers from a serious health condition, and, therefore should have been granted temporary leave under the Family and Medical Leave Act ("FMLA") to take necessary bathroom breaks; and (2) Metro's termination of his employment was done in retaliation to his exercise of his FMLA rights. For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Mauder was an employee of Metro, the operator of the public transportation system for Harris County, Texas, from June 1999 through October 2002 as a Senior Support Center Analyst in Metro's Information Technology Support Center ("Support Center"). The function of the Support Center is to answer telephone calls from internal Metro customers relating to computer problems; Mauder's job duties mainly included providing technical support via telephone, resolving internal customers' technology problems, and assisting others in the IT department in training Support Center Analysts. In February 2002, a new Lead Support Center Analyst ("Supervisor Watkins") was hired and she determined that the Support Center needed improvement, as there were no accountability or customer service standards in place. She also determined that Mauder was "often away from his desk and unavailable to answer customer service calls." Therefore, she sent an e-mail to him explaining that he needed to be more visible. She later instituted specific procedures, scheduled break times, and established attendance policies to make the Support Center more productive.

In March 2000, Mauder missed two weeks of work; he was receiving medical treatment for boils caused by ingrown hairs. Through tests administered during his treatment, Mauder discovered he had Type II diabetes. Mauder returned to work on April 1, 2002, but his return to work notice made no mention of any medical restrictions, though his doctor advised him to change his diet and stop smoking. In mid-April, Mauder's doctor prescribed Metaformin, a generic version of the insulin drug Glucophage, which has a side-effect of temporary uncontrollable bowel movements and diarrhea. Metaformin was prescribed to treat Mauder's diabetes. Mauder, however, explained that

2

he did not experience the side-effects of Metaformin until May or June, at which time Mauder told his doctor because he "thought [his doctor] would like to know." In his brief, Mauder stated that coping with the medication's side-effects "required approximately 15 minutes in the restroom [at a time]. . . . As a result, Mauder was medically required to leave his work station for restroom breaks at unscheduled times."

After the aforementioned procedures, scheduled break periods, attendance policies, etc.,[1] were implemented at the Support Center in May, Supervisor Watkins noticed that Mauder was not adhering to these rules. According to Mauder, his break time was from 9:00 a.m.–9:15 a.m. and 2:00 p.m.–2:15 p.m. and "he could not always [defer his trips to the bathroom] until the scheduled break time." Supervisor Watkins, unaware of Mauder's medical condition, sent an email to him reminding him of the necessity of following such procedures as logging off his computer when he left his desk. Thereafter, she sent another e-mail to Mauder concerning his tardiness in returning from scheduled breaks and mentioning three specific occasions of tardiness. Mauder responded to the first email by sending an email back to Supervisor Watkins stating sarcastically, "[n]o problem. I'll log out even if I back up in my chair"; and he responded to Supervisor Watkins's second email by giving her a handwritten doctor's note which stated that a side-effect of his diabetes medication was diarrhea, but that his condition should improve. Mauder concedes in his brief that he was frequently late, but explains that he told Supervisor Watkins that his medication made him experience severe diarrhea.

---

[1]Supervisor Watkins also implemented the industry standard for two measurements of the Support Center analysts' productivity: "total available time" and "not ready mode." "Total available time" refers to the total time that an analyst is available to answer customer service calls. "Not ready mode" refers to times when an analyst is not available to answer customer service calls. The industry standard for total available time is 37 hours per 40 hour week and the industry standard for not ready mode is 5 minutes per call or 30 minutes per day. During the time period of the events encompassing this appeal, Mauder never satisfied these time guidelines.

3

Despite the inconvenient side-effects of the medication, Mauder states that his doctor concluded that he should continue taking Metaformin. Mauder says that he explained his special circumstances to Supervisor Watkins and that he requested a flexible break schedule. According to Mauder, Metro refused the request and instructed him to take his breaks at the scheduled times.

On June 6, 2002, Mauder sent Supervisor Watkins an email with the subject line "We're losing the 3 Tardy's." He requested that the three instances of tardiness be removed from his record, based on the aforementioned doctor's note. Supervisor Watkins met with Mauder the next day and upon asking Mauder to provide more information regarding his medical condition, Mauder refused and instead stated in a follow-up email that he and his doctor had provided enough information and he would not provide any additional information. Supervisor Watkins denied Mauder's demand that the three incidents of tardiness be removed from his record and that he be allowed flexible break times.

After this incident, Mauder was warned repeatedly regarding his tardiness, both verbally and in written reprimands. He also received his 2002 performance appraisal on June 19, 2002, which noted that "on several occasions especially during peak times [Mauder] has been away from the Support Center." His overall rating of the appraisal was "satisfies most";[2] therefore, Mauder rationalizes that his performance did not suffer even though he took longer breaks. The performance appraisal also noted Mauder's tardiness and unavailability. Less than two weeks later, when his performance did not improve, Supervisor Watkins issued a documented verbal warning to him for repeated tardiness. In August, she issued a written reprimand to Mauder because of his tardiness.

---

[2]On Metro's 4-part ratings scale, "satisfies most" is the second lowest rating. The record reflects that Mauder testified that he considered this rating equivalent to a "C minus."

4

Mauder argues that because of the written reprimand in August, he had his doctor write Supervisor Watkins a final note explaining that his diarrhea may indeed be a permanent side effect of taking Metaformin. Contrary to this assertion, the record reveals that this five-line doctor's note did not take such a position. In fact, in it the doctor explains that "[u]sually the side effects are transient, but not always. I will try to manage the side effects on his next office visit." Supervisor Watkins, according to Mauder, again refused his request for flexible restroom breaks.

Finally, on September 12, 2002, Supervisor Watkins issued a memo indicating that Mauder, because of his unavailability during the work day, would be placed on a one-month corrective action plan effective the next day. This memo also indicated what areas in Mauder's work performance needed improvement; specifically, the memo noted that Mauder needed to increase his work area visibility and improve his negative attitude. Mauder asserts that he was "placed on probation for issues concerning not ready mode and total available time" and "Metro placed him on probation for this conduct with no previous warning and threatened him with termination," which is contrary to "Metro's own progressive disciplinary policy." The record reflects, however, that Supervisor Watkins had issued several previous warnings to Mauder. Furthermore, upon instituting Mauder's probation, she explained to Mauder that the corrective action period would end on October 11, 2002, and that if he did not adhere to the established guidelines during the probationary period, he would be terminated.

On September 25, 2002, Supervisor Watkins issued a memo concerning Mauder's progress during the corrective action period, noting that Mauder had not improved in any of the areas identified in the corrective action plan. A similar record was logged on October 1, 2002, and October 8, 2002. On October 4, 2002, Mauder made his only FMLA leave request to Metro's Human

5

Resources Department ("HR"); in response, HR mailed a FMLA packet to Mauder and explained that Mauder was to return the packet by October 19, 2002. Just one week later, on October 11, 2002, however, Mauder was terminated from his position at Metro. Mauder asserts that his termination was a direct result of his FMLA claim with HR and that he believed, based on his conversation with HR, that his probation would likewise be extended until the packet's due date of return passed.

On January 13, 2003, Mauder filed this lawsuit against Metro, asserting claims for violations of the American With Disabilities Act ("ADA") and the FMLA. On June 22, 2004, Metro filed a motion for summary judgment and, in his response to the motion, Mauder expressly abandoned his ADA claims. On March 28, 2004, the district court granted Metro's motion for summary judgment, stating that Mauder "repeatedly admitted that he did not meet the hour standards during the corrective action period, and he offers no argument or evidence why this legitimate, nondiscriminatory reason for terminating him was a pretext for discrimination." From the grant of the motion, Mauder appeals contending that the district court erroneously concluded that he failed to produce sufficient evidence of a serious health condition under the FMLA and failed to produce sufficient evidence of retaliation by Metro.

## II. DISCUSSION

### A. Standard of Review

The standard of review for a district court's grant of summary judgment is de novo. *Facility Ins. Corp. v. Employers Ins. of Wausau*, 357 F.3d 508, 512 (5th Cir. 2004) (citing *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003)). Summary judgment is only

6

appropriate if the evidence shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c).

B. Overview

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following . . . (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612 (a)(1)(D) (2002). A "Serious Health Condition," defined under the FMLA at 29 C.F.R. § 825.114 (a), is an illness, injury, impairment or physical condition that involves 1) inpatient care or 2) continuing treatment by a health care provider. The regulation refers to diabetes as an example of a chronic serious health condition that may cause episodic rather than a continuing period of incapacity; therefore, we consider diabetes a serious health condition. 29 C.F.R. § 825.114(a)(2)(iii)(C) (2006).

Mauder asserts that he suffers from a "serious health condition involving continuing treatment by a healthcare provider." According to the FMLA, this includes 1) a period of incapacity of more than three consecutive days; 2) any period of incapacity due to pregnancy or prenatal care; or 3) any period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.114(a)(2) (2000). Furthermore, under 29 C.F.R. § 825.114(a)(2)(i), "incapacity" is an inability to work due to the serious health condition, treatment therefore, or recovery therefrom. 29 C.F.R. § 825.114(a)(2)(i) (2006).

We have previously explained that the FMLA contains two distinct provisions. *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999) (citing *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159-60 (1st Cir.

1998)); *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712-13 (7th Cir. 1997)). The first provision of the FMLA creates a series of entitlements or substantive rights. An employee's right to return to the same position after a qualified absence falls under this category. *Nero*, 167 F.3d at 927 (citing *Bocalbos*, 162 F.3d at 383). An employer must honor entitlements, and cannot defend by arguing that it treated all employees identically. *Nero*, 167 F.3d at 927 (citing *Diaz*, 131 F.3d at 712). "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Nero*, 167 F.3d at 927 (citing *Hodgens*, 144 F.3d at 159).

The second provision of the FMLA is proscriptive, and protects employees from retaliation or discrimination for exercising their rights under the FMLA. *Nero*, 167 F.3d at 927; *see also* 29 C.F.R. § 825.220(c) (1997) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave."). In order to establish a prima facie case for a FMLA retaliatory violation, the employee must show the following elements: 1) he is protected under the FMLA; 2) he sought to return to work before the FMLA leave expired; and 3) the employer failed to reinstate him to the position, or an equivalent position." 29 U.S.C. § 2614(a)(1) (2000). The first issue in Mauder's appeal deals with the entitlement provision; the second issue in his appeal deals with the proscriptive provision.

B. Mauder's First Claim: The FMLA Entitlement Provision

In his first issue on appeal, Mauder asserts that he should have been given temporary leave under the FMLA to go to the restroom because of his persistent diarrhea. Unlike other FMLA claims we have considered, Mauder is not asking for an excused absence; he is asking for unfettered permission, while at work, to take necessary restroom breaks. We are unable to locate a case where

8

"temporary" FMLA leave was awarded in such a context–where the leave given does not constitute time away from a place of work, but merely periodic time away from a desk throughout the work day. Despite the novelty of Mauder's FMLA claim, a careful review of the entire record allows us to resolve the key issues presented to us on appeal.

The parties disagree as to whether the underlying cause of Mauder's need for unrestricted bathroom breaks is diabetes or diarrhea. Mauder contends that he requests leave because of his diabetes and that the diarrhea was nothing more than a side-effect of this disease. Metro states that diarrhea is the underlying cause. Nonetheless, even though the record reflects that Mauder's diabetes was under control, that Mauder himself stated that Metaformin successfully regulated his blood sugar level and that Mauder's need for frequent bathroom breaks was because of his diarrhea, the resolution of this debate is not essential to our disposition of the FMLA claim at issue. Based on the facts of this case, even assuming arguendo that Mauder has satisfied the requirements for a "serious medical condition" for either diarrhea or diabetes under the FMLA, the record reflects that he has not shown that this serious medical condition left him incapacitated, as required by the statute. Cases granting FMLA leave to an employee with severe diarrhea involve situations where the medical condition is so debilitating that the employee cannot physically go to work. *Electrolux Home Prod. v. United Auto. Aerospace & Agr. Implement*, 416 F.3d 848, 851 (8th Cir. 2005) ("On a June 2002 leave form, a physician described her illness as 'Abd. Pah, Diarrhea.' On each of these occasions she missed more than three consecutive days of work: three days of work in 2001, five days in April 2002, and three days in June 2002."); *Banks v. CBOCS West, Inc.*, 2005 WL 1126913, *1 (N.D. Ill. 2005) (unpublished) ("On March 14, 2000, Banks was suffering from so much pain, diarrhea and weight loss that he could no longer work."); *Myers v. Bridgestone/Firestone Long-Term Disability*

9

*Benefits Plan*, 2005 WL 1240603 *1 (E.D. Tenn. 2005) (unpublished) ("Those reports indicated that due to the frequency of plaintiff's diarrhea, she was unable to work, that she needed to be near a restroom to accommodate her explosive diarrhea, and that she would need a low stress position if she were to return to work, as stress aggravated her illness."); *McClain v. Sw. Steel Co., Inc.*, 940 F. Supp. 295, 298-300 (N.D. Okla. 1996) (concluding that summary judgment was inappropriate where plaintiff attributed absenteeism to chronic nausea, diarrhea, vomiting, severe headaches, dizziness and/or lightheadedness as symptoms might constitute a serious health problem). Furthermore, as we have previously explained, the FMLA recognizes diabetes as an example of a chronic serious health condition that may cause episodic rather than a continuing period of incapacity. 29 C.F.R. § 825.114(a)(2)(iii)(C) (2006). In Mauder's case, however, he did not experience either episodic or continuing incapacity.

Accordingly, we find that Mauder has not shown that he was incapacitated or that his condition prevented him from going to work. 29 C.F.R. § 825.114(a)(2)(i) (2006) (explaining that the statute applies when one is unable to work due to a serious health condition, treatment therefore, or recovery therefrom). He does not meet the requirements of 29 C.F.R. § 825.114(a)(2) – the regulation defining a "serious health condition involving continuing treatment by a healthcare provider" for purposes of FMLA leave. First, he was not absent from work for the "more than three consecutive days"; the record reflects that Mauder was never absent from work or unable to go to work because of either his diabetes or his diarrhea. Second, he obviously was not incapacitated due to pregnancy or prenatal care. Finally, he was not incapacitated and did not receive treatment for such incapacity due to a chronic serious health condition. Apparently, because he was not incapacitated or unable to attend work, he did not seek treatment for either his diarrhea or his

10

diabetes beyond the initial diagnosis of his diabetes in April and subsequent routine check-ups. Nothing in the record suggests to us that either condition was a serious health condition resulting in incapacity of either an episodic or permanent nature, as defined by the FMLA or case law, preventing Mauder from being physically present at the Support Center. Therefore, because Mauder has not proven that his medical condition left him incapacitated even temporarily, we hold that the district court did not err in determining that Mauder was not entitled to FMLA leave. 29 C.F.R. § 825.114(a)(2)

Furthermore, notwithstanding our discussion of whether leave under the FMLA is even available considering Mauder's condition, the record is clear that Metro should also not be held accountable for not providing Mauder with FMLA leave because Mauder did not provide information requested by Metro that was needed to process Mauder's demands for flexible bathroom breaks. Metro sought more information from Mauder regarding his medical condition and his request for unrestricted bathroom breaks, but in response, Mauder sent an email to Supervisor Watkins on June 12, 2002, in which he stated that he and his doctor had provided "enough information" and would not provide more. Therefore, Supervisor Watkins did not move forward with Mauder's requests.

We interpret the FMLA as a statute that requires cooperation from the employer *and* employee. After all, the ultimate underlying purpose of the FMLA is to accommodate a particular medical circumstance.[3]

In addition to allowing leave for ill employees, the FMLA also protects the employer by providing that "[a]n employer may require that a request for leave . . . be supported by a certification

---

[3]The FMLA was enacted in 1993, as a way to provide job security and reasonable leave for employees with "serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4) (1999).

11

issued by the health care provider of the eligible employee." *Id*. § 2613(a). Such a medical certification will be considered sufficient if it contains certain information, including: (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) if the leave is for the employee's own serious health condition, a statement that the employee is unable to perform the functions of his or her job. 29 U.S.C. § 2613(b) (2000). Mauder, however, did not provide the medical certification requested by Metro. In addition to his bathroom requests, Mauder sent an email to Metro stating that documentation of three tardies should be removed from his record because of his medical condition. Metro had only recently learned of Mauder's condition and responded by asking for additional medical information – a response, as explained above, explicitly allowed under the statute. In turn, Mauder, however, refused to comply with Metro's request. Therefore, Metro explained that the "three tardies" would not be removed and it continued to deny Mauder's repeated requests for temporary leave. These actions are well within Metro's rights under the FMLA as an employer. Mauder cannot complain that he was denied leave when he was previously unwilling to work with his employer to effectuate this leave.

Therefore, because Mauder's illness did not render him incapacitated or absent from work, his medical condition does not fall within the FMLA definition of a serious health condition. Mauder's failure to provide his employer with requested information to effectuate the leave he asked for in the first place is a sufficient reason for us to hold that the district court did not err in granting summary judgment in favor of Metro on this issue. Mauder was not entitled to leave under the FMLA.

C.  Mauder's Second Claim: The FMLA Proscriptive Provision

12

As we explained, Mauder has not established a prima facie case of deprivation under the FMLA because he has presented no evidence that he was incapacitated. For purposes of this claim, however, we will assume arguendo that he has, as there is compelling evidence independent of the first prong that Mauder's claim for retaliation fails.

In order to establish a prima facie case of retaliation under the FMLA, the employee must show the following: 1) he was protected under the FMLA; 2) he suffered an adverse employment action; and 3) he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because he sought protection under the FMLA. *Hunt v. Rapides Healthcare Sys.*, 277 F.3d 757, 768 (5th Cir. 2001). Once the complaining party establishes a prima facie case of deprivation of a substantive right to reinstatement under the FMLA, the burden shifts to the defendant to prove that the plaintiff would have been terminated during the FMLA leave period and is therefore not entitled to restoration of his position. 29 C.F.R. § 825.216(a) (2006). Thereafter, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reasoning presented by the defendant is a pretext for retaliation. *Hunt*, 277 F.3d at 768.

When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the "temporal proximity" between the FMLA leave, and the termination. *Wilson v. Lemington Home for the Aged*, 159 F. Supp.2d 186, 195-96 (W.D. Pa. 2001) (explaining that a causal connection existed between the FMLA leave and the termination when the plaintiff was terminated while on FMLA leave and reasoning that the close proximity in time between FMLA leave and the adverse action establishes the necessary causal connection). Moreover, the plaintiff does not have to show that the protected activity is the only cause of her termination. *Long v. Eastfield Coll.*, 88 F.3d 300 n.4 (5th Cir. 1996) (holding that the plaintiff was not required to show

that the protected activity was the "sole factor" motivating adverse employment action). The plaintiff is, however, required to show that the protected activity and the adverse employment action are not completely unrelated. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

In its brief, Metro points out that there is not a sufficient causal link between Mauder's employment termination and his filing for FMLA leave. It explains that Mauder filed for FMLA leave after three weeks of his one-month probationary program. Further, the record reflects that Mauder was aware that if he did not improve his productivity and attitude, he could be removed from his position. Metro also explains that it presented legitimate, nondiscriminatory reasons for Mauder's discharge. These reasons are documented in the record through corrective action memos as well as verbal and written reprimands. Each instance points to the fact that Mauder was discharged for failing to work in harmony with Metro's time and productivity requirements.

The district court relied on *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), in holding that Mauder did not meet the requirements provided by the FMLA to prove a case of retaliation. *Reeves* is instructive in our analysis of this issue: "if the plaintiff created only a weak inference of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred" a court should not find the plaintiff has successfully proven retaliation. Such is the case for Mauder. His explanations are conclusory and he has produced no evidence in the record that he was discharged because he requested FMLA leave. Metro, on the other hand, has stated that Mauder was discharged (after a corrective action probationary period) because of his failure to perform his work in an efficient and timely manner, specifically, because of his excessive tardiness. In fact, when Mauder requested FMLA leave, he had already been on corrective action approximately three weeks and even admitted

14

in his deposition that he knew he could be discharged if he failed to improve his performance by the October 11, 2002, deadline imposed by Supervisor Watkins.

Furthermore, *Clark County School District v. Breeden,* 532 U.S. 268 (2001), provides insight into Mauder's contention that his termination eight days before the time allotted to file his FMLA leave application expired is evidence of retaliatory action on Metro's part. In *Clark County*, the plaintiff alleged that she had been transferred to a different position in retaliation for filing a Title VII action. *Id*. at 271. The evidence showed that the plaintiff filed her lawsuit on April 1, 1997, and on April 10, 1997, the plaintiff's supervisor mentioned to the president of the teacher's union to which the plaintiff belonged that she was considering transferring the plaintiff. *Id*. at 271-72. The job transfer, however, actually occurred in May. In the lawsuit, the employer filed a motion for summary judgment arguing that there was no causal connection between the filing of the plaintiff's lawsuit and the transfer; the plaintiff, however, relied on the close temporal proximity of the two events. *Id*. at 272. The district court granted the employer's motion for summary judgment because it was not served with the lawsuit until April 11, 1997, after the supervisor has already made the remark to the union president, and the supervisor testified that she did not learn of the lawsuit until after April 11, 1997. *Id*. Thus, the district court found no causal connection to make the transfer rise to the level of retaliatory. *Id*. The Ninth Circuit reversed, holding that the actual transfer occurred a month after the supervisor learned of the plaintiff's lawsuit. *Id*. at 272-73. The Supreme Court, however, agreed with the district court, and held that because the supervisor was contemplating the transfer before she learned of the suit, the supervisor was not required to suspend the transfer proceedings just because the employee filed the lawsuit. *Id*. at 273-74.

15

The facts in *Clark County* are somewhat analogous to the facts in Mauder's appeal. Mauder did not make his request for FMLA leave until October 4, 2002; however, Mauder was notified in his initial corrective action memo, which he received from Supervisor Watkins on September 12, 2002, the day he was placed on probation, that the corrective action period would end on October 11, 2002, and, if his productivity and attitude did not improve, Metro would terminate his employment. Mauder's deposition shows that he was aware that if his performance did not improve by the deadline, he could be terminated. Furthermore, prior to being placed on corrective action, Mauder received a handful of reprimands from Metro regarding his attitude and availability. When his performance and attitude did not improve, he was terminated on October 11, 2002. His termination should not and did not take him by surprise.

Accordingly, just as in *Clark County*, Metro was not required to suspend Mauder's termination pending his FMLA filing. Mauder has not successfully put the ball back in Metro's court; he has not met his burden of proof on this issue, and he does not raise an issue of fact as to whether Metro's reasons for his termination are a mere pretext for his supposed retaliatory discharge. Ultimately, we hold that this case lacks the requisite temporal proximity or substantive evidence to support a finding of retaliation by Metro.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court, finding that Mauder has failed to satisfy the requisite elements for both the entitlement and proscriptive provisions of the FMLA.

16