United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 14, 2004**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

—————————————

No. 03-50335

—————————————

FACILITY INSURANCE CORPORATION,

Plaintiff - Appellee,

versus

EMPLOYERS INSURANCE OF WAUSAU, A Mutual Company,

Defendant - Appellant.

—————————————————————————

Appeal from the United States District Court
For the Western District of Texas

—————————————————————————

Before SMITH, BARKSDALE, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This case is a breach of contract dispute in which Facility Insurance Company ("FIC") seeks to recover monies that it, and its predecessors, paid to Employers Insurance of Wausau ("Wausau"). Wausau argues that FIC is not suing on an open account, so the statute of limitations bars FIC's contract claim. In the alternative, Wausau argues that the disputed contract provision unambiguously establishes that Wausau complied with the contract. We reject both arguments, and accordingly affirm the district court's ruling.

1

**FACTS AND PROCEEDINGS**

FIC is the successor in interest to the Texas Workers Compensation Assigned Risk Pool ("Pool"). In 1953, the Texas Legislature created the Pool as an unincorporated association of workers' compensation insurers. The Pool acted as the insurer of last resort for Texas employers who could not obtain workers' compensation insurance in the private market. Texas law required all workers' compensation insurance carriers to participate in the Pool in proportion to their individual level of Texas business.

The Pool contracted with several of its member insurance companies—including Wausau—to provide a variety of services for the Pool. These servicing companies issued policies, collected premiums, adjusted claims, and improved the insureds' workplace safety through accident prevention measures. The accident prevention measures were also referred to as "loss control services."

In 1989, the State Board of Insurance (the "Board") amended the Pool's contract with its servicing companies. Specifically, the Board amended Paragraph X of the Pool's Rules and Regulations ("Rule X"), entitled "Administration of the Fund." Rule X set forth that the servicing companies would receive 10.0 percent of the premiums as compensation for their services to the Pool. The 1989 amendment to Rule X added a provision stating that one-fifth of the 10.0 percent compensation should be designated for loss control services (*i.e.,* 2.0 percent of the total premiums). Rule X stated that "[t]he shares of premium to which the Servicing Company shall be entitled" included a "Loss Control Services Factor" equivalent to 2.0 percent. In the preamble to this amendment ("Preamble"), the Board stated the following:

> The amended rules and regulation incorporates changes made in Board Order 51959, dated December 22, 1987, a 10% reduction in servicing carrier fees to be effective on and after 12:01 a.m., April 1, 1990, and a requirement that at least two points of the

2

servicing carrier share of premium be used to provide accident prevention services effective April 1, 1990.

In October 1992, the Board again amended Rule X to reduce the "Loss Control Services Factor" from 2.0 percent to 1.4 percent.

During 1990, representatives from the Pool, the Board, and Wausau expressed in writing that each one understood that the 2.0 percent loss control services factor meant that servicing companies *must* devote 2.0 percent of the premium to loss control activities. Between April 1990 and November 2001, Wausau received a total of $7,909,004 in loss control services fees, but only expended $5,382,894 on actual accident prevention measures. Wausau treated the difference between the loss control services factor that Rule X specified, and the amount that Wausau actually spent on accident prevention services—$2,526,110—as general revenue.

Effective January 1, 1991, the Texas Legislature terminated the Pool and replaced it with a new insurer of last resort, the Texas Workers Compensation Insurance Facility ("Facility"). The Facility assumed all of the assets and liabilities of the Pool, including its servicing company contracts, and continued operating in the same manner. On December 31, 1993, the Facility stopped writing policies, but did continue to service the workers' compensation claims that had accrued under the policies it had written prior to that date.[1]

In 1997, the Texas Legislature authorized the unincorporated association of insurers which constituted the Facility to sell the assets and liabilities of the Facility to a private insurance company, the Facility Insurance Corporation ("FIC"). The former members of the Facility became shareholders

---

[1] The Facility stopped writing policies because at that time the Texas Legislature created a new insurer of last resort, the Texas Workers' Compensation Insurance Fund ("Fund"). The Fund did not assume the Facility's assets or liabilities.

of FIC's parent corporation. By statute, FIC was "to be considered a continuation of the [F]acility" with the right to "enforce all contract and statutory rights of the [F]acility under any servicing company arrangements." Texas Acts (1997), 75th Leg., ch. 594, § 1.06(b). After the sale of the Facility, FIC acted as the insurer on the existing policies, and Wausau continued to service those policies pursuant to the servicing contract that it originally entered into with the Pool.

The Pool, the Facility, and later FIC, paid the servicing companies fees by establishing a running account of mutual credits and debits. The transactions were tracked by a "bordereau"[2] and operated as follows: each quarter a servicing company would file a report (a bordereau) with the Pool (or its successor) listing thousands of premium transactions and claim payments that the servicing company handled during the preceding quarter. These amounts were tallied up on the bordereau to arrive at a net amount that the Pool owed to the servicing company as its servicing fee. Although the bordereaux never specified the percentage of the fee applicable towards loss control services, the fee did in fact include an amount for loss control services under the terms of Rule X.

The servicing fees that the Pool (and its successors) paid to the servicing companies were not final. The servicing companies would make adjustments to claims that had already been processed. These claim adjustments would affect the premium amount collected, and in turn the premium amount affected the past servicing fees charged. Consequently, the Pool and the servicing companies revised and corrected past bordereau entries on subsequent bordereaux. These adjustments accordingly affected the amount of fees for loss control services credited to the servicing companies.

---

[2] A "bordereau" (pl. bordereaux) is defined as "a detailed note or memorandum of account." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 133 (10th ed. 1998).

In 1994, the last Facility policy expired. Yet Wausau continued to make adjustments, collect corresponding premiums from insureds, and enter corrections on subsequent premium bordereaux. In October 1997, Wausau processed the last premium transaction on the open account. The last adjustment to the premium and servicing fee portion of the bordereaux occurred in November 1997. On November 5, 2001, FIC closed the premium and servicing fee portion of the bordereau account.

In November 2001, FIC sued Wausau in Texas state court to recover the loss control services fees that Wausau did not expend in loss control services. Wausau timely removed the case to federal court based on diversity jurisdiction. Texas law governs the dispute.

On cross motions for summary judgment, the district court concluded that (1) the statute of limitations does not bar FIC's claim because it is a suit on an open account, and (2) Rule X required Wausau to spend the full amount of loss control services fees on loss control services. The court entered judgment against Wausau for the amount Wausau collected in loss control services fees but did not spend on loss control services, $2,526,110. These two dispositive issues are now before this Court. For the reasons set forth below, we affirm the district court's judgment.

## STANDARD OF REVIEW

The standard of review for a district court's grant of summary judgment is *de novo*. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003). Summary judgment is only appropriate if the evidence shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Gowesky*, 321 F.3d at 507.

## DISCUSSION

## I. Standing

As a threshold matter, Wausau argues that FIC lacks standing to sue Wausau because even if Wausau breached the servicing contract, FIC has not suffered any breach of contract damages. Wausau bases this argument on the fact that the predecessors to FIC were merely "conduits" for the member insurance companies, who were the actual insurers of last resort. Wausau argues that only those member companies have standing to sue for any contract breach.

Wausau's argument is without merit. Texas law provides an unincorporated association the right to sue and be sued in its own name without joining all of its members. TEX. CIV. STAT. CODE ANN. art. 6133 (Vernon 2003).[3] When an association does so, it asserts the collective rights of its members. Accordingly, the Facility could seek redress for an injury to its members. Just as the Facility could seek redress for an injury to its members when an insured fails to pay a premium, *see, e.g., Sunbeam Environmental Services Inc. v. TWCIF*, 71 S.W.3d 846 (Tex. App.—Austin 2002, no writ), so also could the Facility seek redress when the servicing companies did not perform their duties in conformity with Rule X. The Facility thus had standing. When FIC bought the assets of the Facility, FIC bought the rights to pursue the Facility's causes of action. FIC has standing to sue Wausau.

## II. Statute of Limitations

An important issue before this Court is whether the statute of limitations has expired for FIC to bring suit against Wausau. Under Texas law, a party must bring suit for breach of contract within

---

[3] In addition to Article 6133, the legislative act that created the Facility specifically provided that the Facility had "the legal rights of a private person in this state and the power to sue in its own name." TEX. INS. CODE ANN. art. 5.76-2 § 2.05(m), *repealed by* Acts 1997, 75th Leg., ch. 594, § 3.01(1).

four years after the cause of action accrues. TEX. CIV. PRAC. & REM. CODE §§ 16.004(a), 16.051. Normally, a cause of action for breach of contract accrues when the breach occurs. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). If the instant case were a normal breach of contract situation, FIC's suit would be barred as the last alleged breach occurred in October 1997, more than four years prior to the November 2001 suit.

However, Texas law provides a special limitations period for parties suing on an open account. TEX. CIV. PRAC. & REM. CODE § 16.004(c). An open account exists where parties have conducted past and current dealings in a financial account; it remains open as long as the parties expect to conduct future dealings in the account. *Livingston Ford Mercury, Inc. v. Haley*, 997 S.W.2d 425, 427 (Tex. App.—Beaumont 1999, no writ). The Texas Civil Practice and Remedies Code § 16.004(c) ("Section 16.004(c)") states:

> (c) A person . . . must bring an action on an open or stated account . . . not later than four years after the day that the cause of action accrues. *For purposes of this subsection, the cause of action accrues on the day that the dealings in which the parties were interested together cease*.

(emphasis added). Thus, the limitations period for a suit concerning a transaction on an open account does not begin running until the account is closed. *Id.*

Given the extended limitations period on open account disputes, an essential question in the instant case is whether FIC sues Wausau on an open account. A suit on an open account is—among other things—one which arises out of the general course of dealing between a debtor and creditor. *Livingston Ford*, 997 S.W.2d at 427 (citing *McCamant v. Batsell*, 59 Tex. 363, 367-69 (Tex. 1883)). Such a suit need not be restricted to suits involving physical items; Section 16.004(c) includes suits involving performance of services. *Livingston Ford*, 997 S.W.2d at 429 (applying

7

Section 16.004(c) where the parties had a running account for the purpose of accounting for one party's performance of services).

Here, FIC sues Wausau over Wausau's failure to spend all of the monies that the Pool (and its successors) provided to Wausau for the specific purpose of loss control services. The Pool (and its successors) transferred these monies to Wausau through the bordereaux, which is an open account that existed between Wausau and the Pool. FIC argues that because Wausau's obligation to spend the fees earmarked for loss control services was contingent on the bordereau open account, the suit over Wausau's failure to spend those fees is a suit on the open account. Because that account between Wausau and FIC did not close until November 2001, FIC contends that under Section 16.004(c), FIC brought suit against Wausau well within the limitations period.

Wausau does not dispute that the bordereau system constitutes an open account between it and FIC. Wausau disputes, however, that FIC is suing on that account.[4] Wausau offers two general arguments for this conclusion: (1) the bordereaux did not itemize the unspent fees for loss control services, and (2) suits over open accounts can only be over a party's failure to pay for performance. Neither argument is persuasive.

## A. Itemization on an open account

With respect to Wausau's first argument, Wausau concludes that FIC is not suing on the account because the bordereaux did not itemize either the loss control services fees or the amount

---

[4] We decline to address Wausau's argument that FIC's pleadings failed to allege facts sufficient to support a legal theory of an open account. At oral argument, Wausau conceded that it failed to raise the prejudicial effect of this alleged insufficiency at the summary judgment proceedings. Wausau may not raise this argument for the first time on appeal.

of those fees which Wausau failed to spend.[5]  From the fact that FIC is not suing for any specific itemized entry listed "on" the account, Wausau infers that FIC must not be suing "on" the open account.

This argument is untenable.  Wausau equivocates the meaning of "on" in Section 16.004(c), "[a] person . . . must bring an action *on* an open account," with the meaning of "on" in the statement, "FIC does not have an itemized entry listed *on* the open account."  In the former statutory phrase, "on" denotes suing over an item *included* in an account transaction; in the latter statement of fact, "on" denotes the actual presence of an itemized listing.  The meaning of "on" in these two contexts varies significantly.  Consequently, the statutory meaning of "on" does not necessitate the factual condition that Wausau asserts.  The plain language of the statute does not suggest that an item contained *within* an account must be itemized *on* the account in order to bring suit "on an open account."

Wausau further contends that the absence of an itemized entry means that the bordereaux never *accounted* for the fees.  Because the bordereaux apparently never accounted for these expenditures, Wausau infers that the amount credited for loss control services did not contribute to bordereaux balances.  And because a suit over an open account must affect the final balance, this suit, Wausau concludes, must not be over the open account.

_____

[5] The only legal authority that Wausau relies on for the proposition that a transaction must be explicitly *listed* on an open account to properly sue on that account is a 1955 California state appellate decision, *Burchell v. Rohnert*, 283 P.2d 333 (Cal. App. 1955).  That case is inapposite to the instant case.  There, the court held that an employee was not suing on a ledger account for a cash bonus allegedly due him from his employer.  *Id.*  The court reasoned that the cash bonus could not be tied to any entry on that ledger account.  *Id.* at 336.  The disputed bonus did not stem from any transaction within the account.  *Id.*  Here, however, the 2.0 percent loss control services fee can be tied to the bordereau entry for premium percentages that the Pool (and its successors) paid to Wausau.

9

Such reasoning is specious. Wausau concedes that the credits on the bordereaux included payments for loss control services. Notwithstanding the absence of a specific listing for those payments, the credits did include amounts for loss control services. Therefore, the loss control services payments that FIC disputes did contribute to the open account final balance.

Wausau also claims that the failure to itemize Wausau's unspent portion of the fees paid for loss control services implies that the suit is not on an open account. In support of this proposition, Wausau relies exclusively on Texas Rule of Civil Procedure 185 which states: "When any action or defense is founded upon an open account . . . on which a systematic record has been kept . . . ." From this phrase, Wausau argues that to be an actionable open account, the account must have a systematic record, and the alleged amount owed must be calculable from that account. Because the unspent portion of the loss control services fees are not calculable from any amount on the bordereaux, Wausau contends that the action cannot be "on" an open account.

Wausau's inference is completely unsupported. First, the cited statute does not suggest the conclusion that the disputed amount in a suit on an open account must be calculable from that account. The fact that a systematic record must be kept does not imply that the disputed amount must be calculable from that record. Second, Rule 185 is an optional pleading mechanism that allows a plaintiff to prove the *prima facia* validity of particular kinds of claims "for which a systematic record has been kept." TEX. R. CIV. P. 185. An open account is merely one of the categories of such a claim, but a party suing on an open account need not use this pleading mechanism. *See, e.g., Fuqua v. Moody & Clary Co.*, 462 S.W.2d 321 (Tex. Civ. App.—Houston [14th Dist.] 1970, no writ) (suing on an unsworn open account). Rule 185, on which Wausau relies,

10

is irrelevant in determining the validity of an open account claim under Section 16.004(c). Wausau's reliance upon Rule 185 is therefore unfounded.

The absence of an itemized reference to the payment for loss control services does not imply that FIC cannot bring suit on the open account. Wausau's first argument thus fails.

## B. Suit over the failure to perform services

Wausau's second argument is that a suit on an open account can only be over the failure to pay for performance, which non-payment is reflected in the final balance. Wausau attempts to reach this conclusion by citing to cases where a party has sued on an open account for the failure to pay for performance, *see, e.g., Bernsen v. Live Oak Ins. Agency, Inc.*, 52 S.W.3d 306, 309 (Tex. App.—Corpus Christi 2001, no writ); *Kersh & Sons, Inc. v. Texas Employers Ins. Ass'n*, 675 S.W.2d 775, 776-77 (Tex. App.—Beaumont 1984, writ ref'd n.r.e.), and to cases holding that an open account must have a final balance, *see, e.g., Baggett Transp. Co. v. United States*, 319 F.2d 864, 870 (Ct. Cl. 1963); *Seubert Excavators, Inc. v. Eucon Corp.*, 874 P.2d 555, 561-62 (Idaho Ct. App. 1993), *rev'd on other grounds*, 871 P.2d 826 (Idaho 1994).[6] From these two bodies of caselaw, Wausau argues that a suit on an open account can only be over *non-payment* of a *performed* obligation. If this argument were true, then a suit on an open account could not be over the *non-performance* of an item already paid for. According to this reasoning, FIC's suit would not

---

[6] In conjunction with Wausau's statement that an open account must have a final balance, Wausau also argues that this suit is not over the final balance because the account balance has been zero for nearly four years, including the time at which FIC closed the account. The circularity of this argument merits little discussion. A statute of limitations permits a party to dispute a final balance within a set time period, even after that party has apparently accepted the balance. The fact that FIC has "accepted" the zero balance for the past four years is irrelevant in determining whether the open account statute of limitations should apply here.

11

qualify as a suit on an open account because FIC is suing over Wausau's non-performance of its apparent obligation to spend the full amount of loss control services fees.

Wausau's conclusion is wrong. None of the cases on which Wausau relies states that a suit on an open account must be for the non-payment of an obligation already performed. Moreover, upon review of caselaw outside the Fifth Circuit, a suit over a party's failure to perform seems completely permissible on an open account. In *Firestone Tire & Rubber Co. v. Pearson*, the Tenth Circuit held that a party properly brought suit on an open account where the party sued for damages caused by the other party's non-performance of an obligation under an open account agreement. 769 F.2d 1471, 1484 (10th Cir. 1985). In *Pearson*, a retailer alleged that its wholesaler had breached an agreement to exclusively supply its tires only to the retailer. *Id.* Although the prohibited sales were not reflected in the account balance, the Tenth Circuit applied the Utah statute of limitations for suits brought on an open account. *Id.* Consistent with *Pearson*, Wausau is incorrect in asserting that to sue on an open account, a party may only sue over payment due on the account balance. Suing over non-performance appears to be "an action on an open account" under Section 16.004(c).

We hold that for purposes of Section 16.004(c), a suit on an open account can be over an item that is not listed on the account statement yet affects the account balance. We further hold that such a suit can be over the failure to perform an obligation for which payment has been made on that account. Consequently, the Section 16.004(c) statute of limitations period applies in the instant case.

**III. Breach of Contract**

12

The underlying contract dispute centers around the meaning of Rule X. Texas law provides that unless a statute is ambiguous, courts must follow the meaning of a statute's clear language. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 603 (Tex. App.—Austin 2000, pet. denied); *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). Courts must also construe administrative rules in the same manner as statutes. *H.G. Sledge,* 36 S.W.3d at 603; *Rodriguez*, 997 S.W.2d at 254. Finally, courts should strive to give effect to an administrative agency's intent. *H.G. Sledge*, 36 S.W.3d at 603.

Wausau argues that Rule X is an *unambiguous* rule. Rule X states that the servicing company is "entitled" to 2.0 percent of the servicing fees, but does not state that the servicing company is required to spend that *full* amount on loss control services. From this statement, Wausau infers that the 2.0 percent factor represents the portion of the overall servicing fee that *compensates* Wausau for providing the services Wausau had contracted to provide.

This interpretation is wanting. Wausau's interpretation of Rule X contradicts the plain meaning of the Preamble to Rule X. The Texas Code Construction Act states that whether or not a statute is ambiguous on its face, a court may consider the statute's preamble in construing the statute's meaning. TEX. GOV'T CODE § 311.023(7); *accord Helena Chemical Co. v. Wilkins*, 47 S.W.2d 486, 493 (Tex. 2001). The Preamble specifically states that the 1989 amendment includes "a requirement that at least two points of the servicing carrier share of premium be used to provide accident prevention services."

This statement unequivocally expresses that Rule X requires a servicing company to allocate at least 2.0 percent of the overall servicing fees to loss control services. The Board clearly and unambiguously intended for the 1989 amendment to require servicing companies to use 2.0 percent

13

of their premiums for accident prevention services. Thus, the meaning of Rule X is that Wausau was obligated to spend the *full* amount of the loss control factor on loss control services. Reading the Preamble in conjunction with the language of the rule leaves no room for a contrary interpretation of the rule.[7]

Moreover, the language of Rule X, independent of the Preamble, is anything but clear. Rule X does not unambiguously establish that Wausau is not obligated to spend the full 2.0 percent. Rule X could also be read to mean that Wausau is "entitled" to the 2.0 percent because Wausau is responsible to spend the entire 2.0 percent. Consequently, Wausau's claim that the Preamble contradicts the plain meaning of the rule is unfounded. Only by reading the Preamble does the Board's intent of Rule X become clear.

Despite the Board's evident intention of Rule X, Wausau argues that if this Court construed Rule X as being ambiguous on its face, circumstances surrounding the rule's promulgation necessitate Wausau's interpretation. First, in 1992 the Board reduced the loss control services fee to 1.4 percent from 2.0 percent. This reduction, Wausau contends, implies that the Board did not expect Wausau to spend the full amount. Second, in April 1992 the board failed to adopt an amendment that would have required the servicing companies to refund any excess amount of the loss control services fees not spent on servicing the insured. Third, in the past, FIC expressly disavowed that Wausau had a contractual obligation to *refund* any loss control services fees to the

---

[7] The Texas Code Construction Act also permits courts to construe statutes according to the administrative construction of the statute. Tex. Gov't Code § 311.023. With respect to the 1989 amendment to Rule X, the Texas Register states: "The amended rule will reduce the servicing carrier fees by 10% to be effective April 1, 1990. The rule to allocate a minimum of two points of that fee to accident prevention services will be effective April 1, 1990." 15 Tex. Reg. 127, 1990 WL 294552. This administrative construction is consistent with construing Rule X so that it allocates the full 2.0 percent of the servicing fee towards loss control services.

14

Facility. Fourth, as part of its 1997 privatization transaction, the Facility expressed that the servicing companies were not in material default of any term in the servicing agreements. Fifth, Wausau continued to collect servicing fees even after the last policy expired in 1994. Wausau contends that this fact proves that the Facility could not have expected Wausau to spend the full amount of the loss control services factor on loss control services because no insureds existed at that point.

These circumstantial arguments are unavailing. The cited circumstances fail to conclusively establish that Rule X did not obligate Wausau to spend the full amount of the loss control services fees. First, even though the Board reduced the servicing fee to 1.4 percent, the Board could have done so because the servicing companies were failing to spend the *required* amount. Second, the Board's failure to adopt the proposed amendment does not imply that Rule X did not already require the substantive content of that proposal. Indeed, if Rule X already required the servicing companies to spend the full amount, the amendment was arguably unnecessary, and for that reason, the Board should not have adopted it. Third, FIC's express disavowal to refund excess fees could have reflected FIC's intent to apply those excess fees to credits that FIC owed to Wausau on the open account—not an intent for Wausau to keep those excess fees. Fourth, the Facility representative who stated that the servicing companies were not in material default later stated that he in no way intended to imply that the servicing companies were in compliance with every aspect of their contracts.

Fifth, while the last insured's policy expired in 1994, premium adjustments continued after that point. Wausau included the loss control services fee within the premium adjustments on the bordereaux that it submitted to the Facility after 1994. Although the Facility paid the adjusted amount, it is possible that the Facility was unaware that the adjustment included the percent for loss

15

control services because the bordereau did not itemize that amount. In any event, the fact that Wausau collected more than it should have after the policies expired does not imply that FIC is barred from claiming that amount.

As a final point, other extrinsic evidence strongly suggests that Rule X obligated Wausau to spend the full 2.0 percent on loss control services. When Rule X became effective, a representative from the Board, the General Manager of the Pool, and a vice president of Wausau communicated through letters and a memorandum that Rule X required the servicing companies to spend the full 2.0 percent on actual loss control services. This mutual understanding indicates that Rule X did indeed obligate Wausau to spend the entire amount of the loss control services fees on those services.

In view of the Preamble to Rule X, it is clear that the Board intended for Rule X to obligate the servicing companies to spend the full amount of the loss control services fees on loss control services. Rule X itself does not contradict such a construction, nor do the circumstances surrounding the contract.

## CONCLUSION

We thus hold that FIC properly sued Wausau on an open account under Section 16.004(c), and accordingly, FIC has brought suit within the applicable statute of limitations period. Furthermore, we hold that Rule X obligated Wausau to spend the full 2.0 percent (and later 1.4 percent) on loss control services. Wausau now faces liability to FIC for its failure to comply with Rule X. We AFFIRM the district court's judgment.