## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10872

United States Court of Appeals
Fifth Circuit

**FILED**

October 23, 2018

Lyle W. Cayce
Clerk

MICHELLE JACKSON,

      Plaintiff - Appellant

v.

BNSF RAILWAY COMPANY,

      Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:16-CV-695

Before REAVLEY, GRAVES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

BNSF Railway fired Michelle Jackson because it suspected she was taking medical leave when she was not sick. We decide whether Jackson presented a triable retaliation claim under the Family and Medical Leave Act.

I.

Jackson began working at BNSF in 2002. In late 2015, BNSF assigned Jackson to be a Marketing Manager and relocated her from California to

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Texas. She began reporting to Carrie Whitman. In the new position, Jackson helped set the pricing for shipping certain commodities on the railroad and developed a market strategy to increase those shipments.

Jackson struggled in her new role. In an attempt to address the performance problems, Whitman prepared a performance improvement plan. One week after receiving the plan, Jackson left work early and emailed Whitman and Human Resources Director Kelli Courreges that she was "not well," that she was taking "sick time the remainder of the day," that she had an appointment to see a doctor, and that she would follow up when she had more to communicate. Whitman replied: "So sorry to hear that! Take care!"

That same day Jackson contacted BNSF's Employee Assistance Program (EAP). It referred her for an evaluation and notified her about the option of short-term disability benefits. Courreges and Whitman were unaware that Jackson had contacted the EAP. Jackson then emailed Courreges to inform her that she was "not well to return back to work" and that MetLife—the administrator of the disability benefits—"will be forwarding over the proper documentation for [her] approval to be off on short-term disability . . . ." Courreges responded that she hoped that Jackson felt better soon and noted that MetLife would work with Jackson's doctor to obtain the necessary information. Courreges concluded her email: "Please just take care of yourself and let us know when you and your doctor think it is the right time for you to return."

A week after she left work, Jackson attended a Beyoncé concert in the BNSF luxury suite at AT&T Stadium. Jackson had received the tickets from BNSF before she went on medical leave. She attended with a coworker, and other BNSF employees were in the suite.

The next day at work, one of those employees mentioned to someone in Whitman's group that he saw Jackson at the concert even though she was on

medical leave. This information made its way to Courreges. Courreges thought it was "an extremely poor choice for someone who is claiming they can't work at a job where they were already not performing." She did not understand how someone could not work but could go to a concert.

Two days after the concert, Courreges left a voicemail for Jackson asking to discuss her attendance at the Beyoncé concert. Jackson did not immediately respond, but instead contacted the EAP. An EAP employee advised Jackson that EAP could not contact her supervisor but that Jackson should.

Three days after the voicemail was left (which included the weekend), Jackson responded to Courreges with the following email:

> Kelli, good morning. Unfortunately, I haven't been released yet by my doctor to meet, as soon as I am I'll be more than happy to answer any questions at that time. I'm asking for a little patience during this time, thanks.

That same morning, Courreges replied as follows:

> I need to talk to you by close of business today. . . . At this point, your employment may be terminated based upon your failure to communicate with me and/or your attendance at the Beyoncé concert at the BNSF suite on May 8 while you were off work on a medical leave.

Jackson did not respond. Courreges decided to terminate Jackson's employment. She concluded that Jackson was abusing her medical leave based on her attendance at the concert, refusal to discuss that attendance, and taking leave soon after performance problems arose.

Jackson sued in state court, alleging that her termination violated the FMLA. After BNSF removed the case to federal court, Jackson added a state law claim for disability discrimination. The district court granted summary judgment in favor of the railroad on all claims.

No. 17-10872

II.

Jackson pursues two FMLA claims: an interference claim for denying her leave and a retaliation claim alleging BNSF terminated her because she exercised her right to leave. 29 U.S.C. § 2615(a)(1) (interference claim); *id.* § 2615(a)(2) (retaliation claim). She emphasizes that the interference claim does not require any wrongful intent from the employer. *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 491 (5th Cir. 2018); *Nero v. Industries Molding Corp.*, 167 F.3d 921, 926–27 (5th Cir. 1999). On the other hand, as is typical for retaliation claims, the FMLA version of that common employment law statute does. *DeVoss*, 903 F.3d at 491; *Mauder v. Metropolitan Transit Auth. of Harris County*, 446 F.3d 574, 583 (5th Cir. 2006).

While it is true that an FMLA interference claim does not require a showing of bad intent, it is also of course true that only an employee is entitled to take leave. So if an employee is fired for a nonprohibited reason—say the employer discovers that the employee was embezzling—then the right to medical leave terminates when the employment ends. When an employee is terminated after exercising her right to leave, the availability of any FMLA relief thus typically turns on whether the fired employee can prove retaliation. *DeVoss*, 903 F.3d at 491 (explaining in a similar context that "the nature of the claim is more important than the label it is given"); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282–83 (6th Cir. 2012) (concluding that the district court properly treated "indistinguishable" FMLA interference and retaliation claims as a retaliation claim); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050–51 (8th Cir. 2006) (deciding that the district court properly consolidated employee's interference and retaliation claims as a retaliation claim). If she can, then she should not have been fired and it follows that she retained the leave rights that any other employee enjoys. But if she cannot show retaliation—that is, if the employer lawfully terminated her—then once she

4

was no longer an employee she had no leave rights to assert.  Jackson thus must show that her termination was unlawful because it was retaliation for her taking medical leave.  *See DeVoss*, 903 F.3d at 491 (holding that when the crux of plaintiff's claim is that she was fired "for taking (or attempting to take) FMLA-eligible leave," then the plaintiff must show retaliatory intent).

The viability of that retaliation claims come down, as it often does, to whether Jackson can show that the lawful reason the railroad articulated for the firing is a pretext that masks its unlawful motive.  *See Harrelson v. Lufkin Indus.*, 614 F. App'x 761, 764–65 (5th Cir. 2015).  The lawful justification BNSF cites is its concern that Jackson was not being honest about needing to take leave.  Even if it turns out there was a medical explanation for needing to take leave yet being able to attend the concert, BNSF's belief that leave was being abused qualifies as a legitimate nonretaliatory reason if it had good-faith basis for that belief.  *DeVoss*, 903 F.3d at 492 (recognizing in an FMLA retaliation case that an employer's good-faith belief that an employee is being dishonest in taking leave is a nonretaliatory reason).  Jackson's attendance at the concert compounded by her unwillingness to discuss it demonstrate the reasonableness of BNSF's concern.  So Jackson needs evidence showing that this concern about leave abuse was actually a ruse.

We agree with the district court that Jackson did not present such evidence that would allow a jury to conclude that BNSF was not in fact motivated by concerns that she was abusing leave but instead was punishing her for taking her federally guaranteed leave.  For starters, BNSF readily honored her leave request when it was first made.  A coworker—not a supervisor or human resource employee who would have to have the retaliatory motive—noted the seeming inconsistency between being able to attend a concert yet not being able to show up at the office. The coworker's concern did not result in cancellation of Jackson's leave, but only an inquiry about the

possible discrepancy.  Only after Jackson refused two requests to discuss her concert attendance did Courreges fire her.  Jackson's failure to explain why she could attend the concert but not work, or to provide any information about her medical condition in response to BNSF's concerns, means there is nothing she can point to that should have caused Courreges to understand the seeming inconsistency.  As a result, there is not evidence that would allow the jury to find that this sequence of events resulting in Jackson's termination was pretextual.  The district court correctly dismissed the FMLA claim.

The absence of evidence that undermines the railroad's lawful explanation for the firing also dooms Jackson's state law claim for disability discrimination.  *See Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (adopting for Texas disability discrimination claims the federal *McDonnell Douglas* standard used to evaluate circumstantial evidence at summary judgment).

\* \* \*

The judgment is AFFIRMED.