**BANK OF AMERICA, Fleet Bank d/b/a Fleet Leasing, Bank of America Corporation, and Fleetboston Financial Corporation d/b/a Fleet Leasing and National Bank, Appellants,**

v.

**JEFF TAYLOR LLC d/b/a Innovative Office Systems, Appellee.**

No. 12–10–00028–CV.

Court of Appeals of Texas, Tyler.

Jan. 25, 2012.

Clinton A. Rosenthal, Robert M. O'boyle, for Appellants.

Edward J. Hennessy, Randall D. Wilkins, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## *OPINION*

JAMES T. WORTHEN, Chief Justice.

Bank of America, Fleet Bank d/b/a Fleet Leasing, Bank of America Corporation, and Fleet Boston Financial Corporation d/b/a Fleet Leasing & National Bank (BOA) appeal the judgment of the trial court. They raise three issues on appeal. We affirm.

### BACKGROUND

This case arises out of a dispute between BOA and Appellee, Jeff Taylor LLC d/b/a Innovative Office Systems (Innovative), regarding amounts Innovative contends it is owed under the Sharp Electronics National and Government Accounts Program (the SNAP program).

### 1. The SNAP Program

Sharp Electronics Corporation (Sharp), which was not a party to the underlying lawsuit, manufactures office equipment such as photocopiers and related products

as part of its business. To facilitate the sale of these photocopiers to large corporate and governmental entities, Sharp created the SNAP program.

As part of the SNAP Program, Innovative executed an agreement with Sharp (the Representative Agreement) to become a local authorized dealer and servicer of Sharp photocopiers and related office equipment. Also as part of the SNAP program, Sharp executed a separate agreement with BOA called the "Master Program Agreement," which governed the relationship between Sharp and BOA.[1] A third document, the "Dealer Policies and Procedures Manual," was promulgated by Sharp to explain the procedures for administering the SNAP program, and was incorporated by reference into the Representative Agreement. Jeff Taylor referred to this lengthy document as the "Sharp Bible."

Through the efforts of local dealers like Innovative, the customers, usually large corporations and governmental entities, entered into transactions with Sharp for the short term rental, longer term lease, or outright purchase of a Sharp photocopier or other office equipment.[2] Generally speaking, Innovative was required to be Sharp's sales force within a certain geographically designated territory in the East Texas area. Also, Innovative was responsible for obtaining delivery of the equipment, installing the equipment at the customer's place of business, ensuring the equipment was operational, and providing training to the customer's staff. In the case of rentals and leases, Innovative was also responsible for removal of the equipment at the end of the rental period or

expiration of the lease. Innovative was likewise required to service and maintain the equipment. This duty obligated it to make technical repairs and replace essential components such as toner cartridges. Finally, many of the photocopiers contained, and Innovative was required to take, meter readings as necessary for the purpose of calculating "overage charges," depending on the particular terms of the transaction with the customer.

BOA paid Innovative three primary types of compensation for the products and services Innovative provided under the SNAP Program. First, Innovative was compensated for the installation of the equipment based on an "installation report." Innovative would forward the installation report to BOA, which triggered BOA's duty to pay Innovative for the sales/installation or "up-front" compensation. This event also required BOA and Innovative to track the equipment's usage, which in turn determined the remainder of Innovative's compensation. The second form of compensation Innovative received was "base rate" compensation. The base rate was generally set compensation based on an allotment of copies allowed the customer each month, which was determined by the underlying contract between the customer and Sharp. This base amount could increase or decrease depending on whether the customer made changes to the rental contract, such as adding or removing equipment, depending on its needs. Innovative also took meter readings to determine whether the customer exceeded the number of allotted copies, and if so, by how many copies. Compensation for the

1. Sharp originally entered into the transaction at issue in this appeal with Sanwa Leasing. Sanwa Leasing was acquired by Fleet Leasing, which was subsequently acquired by BOA. The parties agree that BOA acquired all rights in the agreements of its predeces-

sors. For the sake of simplicity, we refer to all of these entities as BOA.

2. As relevant here, most of Sharp's customers elected the short term rental option.

excess, if any, was called an "overage charge," and represented the third form of compensation. The customer's contract included a "multiplier," usually between one-half cent and one cent depending on the customer's contract. The number of copies above the base allotment was multiplied by the multiplier rate, and that amount was paid by BOA directly to Innovative in full. Each month, BOA would send a faxed list of the photocopiers that required meter readings. Innovative called each customer on the list and took the meter readings, recorded them, and faxed the list back to BOA.

BOA used these meter readings, along with the ordinary contractual rental payment for that month, to bill the customer. The Master Program Agreement required BOA to pay Innovative once it invoiced the customer each month. However, customers often delayed in forwarding their meter readings to Innovative, which in turn made it difficult to track the amounts owed on each photocopier. The base rate compensation and the overage charges (which together were often called service and maintenance compensation), were paid together at one time in one check on several different photocopiers for different customers. That is, Innovative received one or two checks a month that covered several photocopiers on several accounts. The check was accompanied by a "remittance report," which listed several pieces of information, including a "due date," a total amount paid for a particular copier, the name of the client, the model number, and the serial number of the photocopier. However, the reports did not reflect what time period the check covered for a given copier, or whether the base rate was changed during the payment period. Nor did the reports itemize an amount for excess compensation. Thus, with only a total amount on a given machine, and due to the lag that often accompanied submission of the invoice, Innovative could not determine from BOA's checks and remittance reports the precise work for which BOA was compensating Innovative. Complicating matters is the fact that BOA had the right to assess "charge backs" by which it could debit amounts owed to Innovative on future checks if a given rental agreement was cancelled, terminated, or modified by the customer, BOA, or Sharp.

To further increase the complexity of the arrangement, the customers would often add or remove equipment, which in turn resulted in modifications to the rates and terms of the individual contracts each customer had with Sharp. This would also modify the amount BOA and, consequently, Innovative, would receive each month. Moreover, the transactions were often flexible to accommodate customer needs and to remain competitive in the industry. The Sharp Bible even had a provision notifying Innovative that dealers might not necessarily be paid in strict accordance with the contract because Sharp could modify payment schedules in order to obtain competitive bids and could negotiate special rates. This meant that Innovative could be required to accept reduced compensation in unknown amounts from unknown accounts at unknown times.

During the years Innovative worked with BOA and Sharp in the SNAP Program, there were approximately 100 copiers rented at any given time to the approximately 400 customers they had during the existence of their relationship. To keep track of its work, Innovative created invoices. When Innovative made service calls, it created invoices for the work that was completed. Also, Innovative created invoices when it provided toner cartridges and other parts required for maintenance on the machines. There was never any charge specifically connected to that labor or those parts, because Innovative's com-

pensation for maintenance and parts was bundled as part of its ordinary base compensation. The invoices were strictly for Innovative's internal recordkeeping, inventory tracking, and accounting purposes. For example, if a customer needed a toner cartridge, Innovative created an invoice so that it knew when to reorder more cartridges.

Innovative initially sent its invoices to BOA, but was told not to continue that practice, because BOA had its own system of keeping track of how and when to pay Innovative. Christy Young, the office manager at Innovative, applied each payment received from BOA to the oldest Innovative invoice, in essence treating the transaction as an ongoing account. Because Innovative and BOA had different payment and accounting systems, a breakdown in communication occurred, and a dispute arose between Innovative and BOA about how much was owed. Even though they were all aware that Innovative contended it had not been paid all it was owed as of 2003, the parties continued to work together until 2007.[3] Innovative then began providing similar services and products on behalf of Kyocera due to the dispute and loss of revenues from BOA.

### 2. The Lawsuit

In an April 2003 demand letter to BOA, Innovative sought payment for unpaid invoices dating back to 2001 and totaling approximately $59,000.00. Sharp preferred to informally mediate between Innovative and BOA rather than allowing Innovative and BOA to resolve their dispute directly with each other. The parties were able to agree that some of the money was owed, and BOA paid approximately $15,000.00, reducing the sum Innovative claimed was owed to approximately $44,000.00. It became clear that Innovative and BOA could not agree on the remaining portion of the claim, and Innovative filed suit to recover approximately $44,000.00 for the unpaid invoices.

■ BOA moved for summary judgment on the four year breach of contract statute of limitations. In the motion, BOA argued that the parties' dealings arose under a "special contract" as a matter of law. BOA contended that because the parties' dealings were a "special contract," Innovative's claims accrued when each invoice was due but not paid.[4] Those invoices dated back to 2001, but suit was not filed until 2007. Innovative amended its petition and added claims for quantum meruit and for a suit on an "open account." Innovative also responded to BOA's motion for summary judgment, arguing that its claims rested on an "open account," not a "special contract." Due to a special limitations provision for open accounts, Innovative argued that the statute of limitations did not begin to run on its claims until 2007, when the dealings between the parties ceased.[5] Both Innovative and BOA contended that whether the transactions at issue created a special contract or an open account was a question of law.

**3.** Innovative ceased doing work with BOA and Sharp in 2007, but continued to receive very small checks until January or February 2008.

**4.** *See* TEX. CIV PRAC. & REM.CODE ANN. § 16.004(a)(3) (West 2002) (statute of limitations on claim for debit is four year from time cause of action accrues); *Lerner v. First Commerce Bank* ("actions for debt" has been construed to include actions for breach of a written contract). Ordinarily, such a claim accrues when the contract is breached. *See Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002).

**5.** *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(c) (West 2002) ("A person ... must bring an action on an open or stated account ... not later than four years after the day that the cause of action accrues.").

After a hearing, the trial court denied BOA's motion for summary judgment, and the parties proceeded to a jury trial. During the course of the trial, BOA stipulated that Innovative was a third party beneficiary of the Master Agreement.[6] Innovative stipulated that, if the parties' dealings rested on a special contract, Innovative's claims for any charges prior to August 24, 2003, on the Innovative spreadsheet were time barred as a matter of law. Specifically, Innovative stipulated that all invoices dated prior to

August the 24th of 2003, the cause of action—any cause of action for those invoices would have accrued as of August the 24th 2003, if in fact, we are deemed to have—the jury finds a special contract as opposed to an open account.

THE COURT: Okay.

. . . .

[BOA'S COUNSEL:] Okay. Just for clarification, you're stipulating that all of the claims on any amount set forth in an invoice dated prior to August 24, 2003, has accrued for limitations purposes?

[INNOVATIVE'S COUNSEL:] They've accrued for limitations purposes only if it is determined that there was a special [contract] that governed the relationship between the parties as opposed to an open account. They're not barred if there's an open account.

. . . .

[BOA'S COUNSEL:] Okay. I think we're in agreement.

Thus, the parties agreed that the central dispute in the case was whether the relationship between the parties derived from a special contract or an open account. They agreed that the answer to that question determined the date upon which limitations began to run. Over the objection

of both BOA and Innovative, the trial court submitted the issue to the jury and charged the jury in relevant part as follows:

Were the dealings between Innovative and Bank of America based on a special contract or an open account?

A "special contract" is one in which all the terms of the contract are fixed and certain.

An "account" applies to transactions between parties upon the provision of a good or service by one party and the payment for that good or service by the other party and the relation of debtor and creditor is thereby created by a general course of dealing.

An account is "open" when the parties intend and expect further transactions between them of indefinite duration.

ANSWER:

Answer "Special Contract" or "Open Account"

The jury answered "open account." Because the parties had stipulated that Innovative's claims were not barred by limitations if they had an open account, BOA's limitations argument failed.

The jury awarded Innovative $43,320.91 in damages, and $40,930.24 in attorney's fees. The trial court reduced the fee award to $38,430.24, and signed a judgment against BOA for the full amount of damages the jury awarded to Innovative. BOA filed a motion for new trial, which, based on the record before us, appears to have been overruled by operation of law. BOA appealed to this court.

### SPECIAL CONTRACT OR OPEN ACCOUNT- ISSUES PRESENTED

In its first issue, BOA argues that the evidence establishes the parties' transac-

---

**6.** Innovative nonsuited its quantum meruit claim in light of this stipulation.

tions created a special contract as a matter of law, and that a special contract and an open account are mutually exclusive. In three subarguments, BOA contends more specifically that (1) an open account is a form of "quasi-contract" and cannot exist when, as here, the parties have an express contract; (2) the terms of the parties' agreement were fixed and certain, which precluded the existence of an open account; and (3) the contracts governing the parties' relationship negate the essential elements of an open account as a matter of law. As a result, BOA contends, the special limitations provision relating to open accounts does not apply, and therefore Innovative's claims accrued when each invoice was due but not paid. Thus, BOA urges that because Innovative did not file suit until more than four years after its claims accrued, Innovative's claims are barred. Also in its first issue, BOA argues that the trial court reversibly erred in submitting the special contract/open account issue to the jury because the issue was a question of law. In its second issue, BOA challenges the trial court's award of attorney's fees, and in its third issue, it contends that the trial court submitted an erroneous definition of special contract in the jury charge.

The special accrual provision of Section 16.004(c) applies only to open accounts. And the parties stipulated at trial that Innovative's claims were barred if their relationship was governed by a special contract. Therefore, the dispositive question here is whether Innovative established the existence of an open account. Accordingly, we will begin with the issues relating to that question and then address any other issues necessary to the disposition of the appeal.

### QUASI-CONTRACT

BOA argues that an open account is a type of "quasi-contract," that "quasi-con-

tracts" cannot arise when there is an express contract covering the subject matter of the parties' dispute, and thus there can be no open account here because the SNAP contracts are express contracts.

■■■ A quasi-contract "is not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended." *See Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex.2000). In fact, it is created sometimes even against a clear expression of dissent. *Ferrous Prods. Co. v. Gulf States Trading Co.,* 323 S.W.2d 292, 297 (Tex.Civ.App.-Houston 1959), *aff'd,* 160 Tex. 399, 332 S.W.2d 310 (1960). "The principal function of quasi-contract is generally said to be that of prevention of unjust enrichment." *Fortune Prod. Co.,* 52 S.W.3d at 683. A quasi-contract, or a contract implied in law, is distinguishable from a contract implied in fact, which is a true contract that arises when a mutual intention to contract is implied from the facts and circumstances. *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,* 480 S.W.2d 607, 609 (Tex.1972). An express contract arises when the contractual terms are stated by the parties. *Id.* Here, it is undisputed that an express contract governed the relationship between the parties.

■■ In *McCamant v. Batsell,* the Texas Supreme Court stated that the term "open account" in the context of the statute of limitations, albeit in dicta, "evidently has reference to dealings between persons ... from which, by *contract, express or implied,* the receiver becomes the debtor." *McCamant v. Batsell,* 59 Tex. 363, 368 (Tex.1883) (emphasis added). Other courts have implicitly recognized that an open account can exist for limitations purposes when the parties' relationship was governed by an express contract, even

though the fact that they had an express contract was not an issue in the suit. *See, e.g., Capital One Bank (USA) v. Conti,* 345 S.W.3d 490, 492 (Tex.App.-San Antonio 2011, no pet.). We see no reason to hold that an express contract forecloses the existence of an open account for limitations purposes under Section 16.004(c). The portion of BOA's first issue that pertains to quasi-contract is overruled.

## ELEMENTS OF OPEN ACCOUNT UNDER SECTION 16.004(c)

Section 16.004 does not define "open account," and the parties disagree about the elements. BOA contends that an open account, for limitations purposes, requires, among other things, a sale and delivery of goods or services, passage of title, and payment directly between Innovative and BOA. It also argues that at least one term of the agreement must be left open and undefined. Innovative disagrees. Accordingly, we must identify the elements of an open account under Section 16.004(c) before determining whether Innovative established an open account. The Beaumont court of appeals has decided the leading case on the issue. *See generally Livingston Ford Mercury, Inc. v. Haley,* 997 S.W.2d 425 (Tex.App.-Beaumont 1999, no pet.)

### The Haley Opinion

In *Haley,* a radio station brought suit against a car dealership that purchased radio advertising on account. *Id.* at 427. The parties did business together for several years, and when their relationship ceased, the radio station claimed that the car dealership owed it money. *Id.* The radio station brought a suit on a sworn account under Texas Rule of Civil Procedure 185, and the car dealership asserted a limitations defense. *Id.* The dealership, like BOA, claimed that the limitations provision in Section 16.004(a)(3) controlled.

The radio station, like Innovative, claimed that the suit was on an open account, and the limitations period did not begin running until their relationship ceased as provided in Section 16.004(c). *See id.* Resolution of the issue turned on whether the account was an open account as that term is used in Section 16.004(c).

■ The *Haley* court traced the origin of the open account definition to *McCamant v. Batsell,* 59 Tex. 363 (Tex.1883). In *McCamant,* the court first defined "account" as follows:

> As used in the statutes of this state, *in act referred to,* we believe that the word *"account"* is used in its popular sense, rather than in a technical sense, and that it applies to *transactions between persons* in which, by *sale upon the one side and purchase upon the other, the title to personal property passes* from the one to the other, and the *relation of debtor and creditor is thereby created by general course of dealing* ....

*McCamant,* 59 Tex. at 367–68 (emphasis added). The court then noted several distinguishing characteristics of an account that is "open," but ultimately applied the following definitions to the facts before it:

> An *"open account"* is defined to be "one in respect to which nothing has occurred to bind either party by its statements; an account which is yet fully open to be disputed." Abbott's Law Dictionary.
>
> ....
>
> An *account* is said to be *open* also, when there have been *running or current dealings between the parties,* and the account is kept *open with the expectation of further dealings.*

*Id.* at 368–69 (emphasis added). Although the court in *McCamant* was not construing any predecessor statute to Section

16.004(c), it stated in dicta that the same definitions should apply in other contexts, including limitations.[7] *Id.* at 368.

The *McCamant* definition of "open account" contemplated the passage of title to "personal property." The dispute in *Haley* was whether this definition of open account applied to services, and not merely goods, for limitations purposes. *Haley*, 997 S.W.2d at 427. Thus, the *Haley* court also traced the evolution of Section 16.004(c). *See id.* at 427–28.

First, the court examined Articles 5526 and 5527 of the 1925 Revised Civil Statutes, the predecessors to Section 16.004(c). Those articles were essentially the same as the 1879 version in effect at the time *McCamant* was decided.[8] *See Haley*, 997 S.W.2d at 427–28. The 1925 version of the relevant portions stated as follows:

> Art. 5526. There shall be commenced and prosecuted within *two years* after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:
>
> . . . .
>
> 5. Actions upon stated or *open accounts, other than such mutual and current accounts as concern the trade of merchandise between merchant and merchant, their factors or agents.* In all accounts, except those between merchant and merchant, as aforesaid, their factors and agents, the respective *times*
> *or dates of the delivery* of the several articles charged *shall be particularly specified,* and *limitation shall run against each item from the date of such delivery,* unless otherwise specially contracted.
>
> . . . .
>
> Art. 5527. There shall be commenced and prosecuted *within four years* after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:
>
> . . . .
>
> 3. Actions by one partner against his co-partner for a settlement of the partnership accounts, or upon *mutual and current accounts concerning the trade of merchandise between merchant and merchant, their factors or agents;* and the *cause of action* shall be considered as having *accrued on a cessation of the dealings in which they were interested together.*

*Id.* at 428 (emphasis added).

The statutes remained unmodified until the legislature made significant changes in 1979, which were codified in the civil practice and remedies code in 1985. *See* Act of May 27, 1979, 66th Leg., R.S., ch. 716, §§ 1, 2, 1979 Tex. Gen. Laws 1768, 1768–69; *see also* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, sec. 16.004(c), 1985 Tex. Gen. Laws 3242, 3252 (codifying Section 16.004 of the Civil Practice and Reme-

---

7. In *McCamant*, the court was construing Article 2266, the predecessor to Texas Rule of Civil Procedure 185, and not a statute of limitations. The court limited its holding when it stated that the definition applied "in [the] act referred to," that is, Article 2266. *McCamant*, 59 Tex. at 367. Nevertheless, the court stated in dicta that it saw no reason to vary the definition in other contexts, and specifically mentioned the limitations context. *Id.* at 368. The court also examined several other definitions of open account in different contexts and noted that the term may be used in apposition to a stated account "in many

instances, we have no doubt; but it does not follow that it is used in no other sense." *Id.* at 369. A careful reading of *McCamant* demonstrates that an open account is a fluid, flexible term depending on the context in which it is used.

8. *See* Tex. Rev. Stats. arts. 3203–3205 (1879), *renumbered at* Tex. Rev. Stats. art. 3354–3356 (1895), *renumbered at* Tex. Rev. Stats. art. 5687–5688 (1911), *renumbered at* Tex. Rev. Stats. art. 5526–5527 (1925).

dies Code). As pertinent here, the 1979 amendment is essentially the same as the current statute, which reads as follows:

(a) A person *must bring suit* on the following actions *not later than four years* after the day the cause of action accrues:

. . .

(3) *debt;*

. . . .

(c) A person must bring suit against his partner for a settlement of partnership accounts, and *must bring an action on an open* ... *account,* or on a mutual and current account concerning the trade of merchandise between merchants or their agents or factors, *not later than four years* after the day that the cause of action accrues. For purposes of this subsection, the *cause of action accrues on the day that the dealings in which the parties were interested together cease.*

TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3), (c) (emphasis added)

Thus, under the pre–1979 statutes, suits on open accounts that were not mutual and current accounts concerning the trade of merchandise between merchants were required to be brought within two years from the date of delivery of each "item." After the 1979 amendments, all accounts, including open accounts, were brought within the four year statute of limitations. Moreover, the accrual provision was modified to include both open accounts and mutual and current accounts between merchants. Consequently, for both types of accounts, the cause of action now accrues "on the day that the dealings in which the parties were interested together cease."

In *Haley,* the court held that since the word "item" was deleted from the statute in the 1979 amendments, the *McCamant* definition was modified to include services, as well as goods or "items." *See Haley,* 997 S.W.2d at 428–29. However, the *McCamant* definition also requires delivery and passage of title. By the 1979 amendments, the legislature deleted the reference to "delivery," as well as the provision that the limitation period for open accounts began running on the "delivery" of "each item." Further, the "passage of title" requirement in the *McCamant* definition pertains to goods, but not services. Therefore, we conclude that the amended statute also modified the *McCamant* definition as to these requirements. Accordingly, we hold that under the amended statute, the *McCamant* definition no longer requires delivery or passage of title for an open account under Section 16.004(c).

Moreover, from this modification, it has been implied that, for limitations purposes, the goods or services need not be provided directly between the parties disputing the existence of an open account. Consequently, an open account may arise without a sale on one side of the transaction and a purchase on the other. In other words, goods or services may be provided to third parties, or purchases made from third parties, so long as there is a transaction creating a creditor-debtor relationship through a general course of dealing between the parties disputing the existence of an open account.

This change has become evident in the definition of "open account" for limitations purposes that has been applied in credit card collection cases. *Conti,* 345 S.W.3d at 491–92 (stating an action to collect credit card debt can be brought as action on open account for Section 16.004(c) purposes). In credit card cases, the bank issues a credit card to the cardholder, the cardholder makes purchases of goods and services from third-party vendors, the bank pays the vendors, the cardholder pays the bank, and the bank accrues an interest

charge. *See Eaves v. Unifund CCR Partners*, 301 S.W.3d 402, 408–09 (Tex.App.-El Paso 2009, no pet.).

■ In the instant case, Innovative provided goods and services to third parties, the third parties paid BOA, BOA paid Innovative, and BOA retained a portion of the balance as profit. We recognize that the transactions flow in different directions between the parties to a credit card transaction and the parties in the instant case. What is important is that goods or services need not be directly provided to, and payment for those goods or services need not directly be made by, a party disputing the existence of an open account. Therefore, we also hold that payment directly between Innovative and BOA was not required for an open account.

### *Open Term Requirement*

BOA next contends that before an open account can arise, certain terms of the contract must be left open, i.e., the terms cannot be fixed and certain. Innovative states that if an open term is a requirement, it has shown that an open term exists here.

In *McCamant*, the court applied two separate definitions of open account to the facts before it. *McCamant*, 59 Tex. at 368. The first definition provided that an account is open when "nothing has occurred to bind either party by its statements; an account which is yet fully open to be disputed." *Id.* The second provided that "[a]n account is said to be open, also, when there have been running or current dealings between the parties, and the account is kept open with the expectation of further dealings." *Id.* Later in the opinion, the court observed that the word "open" indicates that "there is something undetermined by contract of the parties or by application of settled rules of law, and it would seem that an account cannot be said

to be *open* when there remains no term of the contract to be settled by agreement of the parties." *Id.* Based on the language in *McCamant*, it is not clear whether an open term must exist for an account to be "open" for limitations purposes.

Modern cases have used differing definitions in determining whether a particular account is "open" for limitations purposes. *See, e.g., Facility Ins. Corp. v. Emp'rs Ins. of Wausau*, 357 F.3d 508, 513 (5th Cir. 2004) (holding that open account exists for Section 16.004(c) purposes where parties have conducted past and current dealings in financial account arising out of general course of dealing between debtor and creditor, and remains open as long as parties expect to conduct future dealings on account); *Haley*, 997 S.W.2d at 427 (defining "open account" as "one in respect to which nothing has occurred to bind either party by its statements; an account which is yet fully open to be disputed[,]" and one in which "there have been running or current dealings between the parties, and the account is kept open with the expectation of further dealings"); *Conti*, 345 S.W.3d at 491–92 (holding that elements of open account are (1) transactions between parties, (2) creating creditor-debtor relationship through general course of dealing, (3) with account still being open, and (4) with expectation of further dealings). These cases illustrate that courts defining "open account" for limitations purposes generally have stated the elements in terms of the second definition applied in *McCamant*. Of the cases cited above, only *Haley* has included both definitions. *See Haley*, 997 S.W.2d at 427. Moreover, these cases do not discuss the open term requirement mentioned in *McCamant*. After listing the elements of an open account, the court stated in *Conti* that "[a] credit card may be considered an open account because, under a credit card agreement, the terms

of repayment remain subject to modification, and the parties exchange credits and debits until either party settles the balance and closes the account." *See Conti,* 345 S.W.3d at 491–92. By this statement, the court appears to acknowledge that the payment terms of a credit card are not fixed and certain, but it does not incorporate an open term as an element of an open account. *See id.*

■ Based on our reading of the cases cited by the parties, those cited above, including *McCamant,* and others addressing the meaning of "open account" in a limitations context, we hold that for an account to be open under Section 16.004(c), there must be (1) transactions between the parties, (2) creating a creditor-debtor relationship through the general course of dealing, (3) with the account still being open, and (4) with the expectation of further dealings. We need not decide whether an open term is also required for limitations purposes because, as we discuss in the following section, Innovative has shown the existence of an open term as a matter of law.

### Proof of Open Account

■ BOA contends that whether an open account exists is always a question of law. Innovative contends the issue presents a question of law here. We agree that whether an open account exists here presents a question of law, and review the issue de novo. *See Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 318 (Tex.2002) ("We review questions of law de novo.").

BOA argues that all of the terms in the contract at issue were fixed and certain, which defeats Innovative's open account claim. BOA further contends that it established a special contract as a matter of law. Innovative counters that it established the existence of an open term (the payment term) and established an open account as a matter of law.

In a case similar to the instant case, Sunshine Traders had a contract with Dolgencorp, in which Sunshine was to manufacture jeans to be sold in Dolgencorp's Dollar General stores. *Sunshine Traders of El Paso, Inc. v. Dolgencorp, Inc.,* 219 Fed.Appx. 375, 376 (5th Cir.2007). After disputes arose under the contract, Dolgencorp refused to pay on two of the invoices Sunshine Traders sent Dolgencorp. *Id.* The trial court granted summary judgment against Sunshine Traders because limitations had run, even though Sunshine Traders argued that the parties had an open account and limitations was governed by Section 16.004(c). *Id.* On appeal, the Fifth Circuit reversed, holding that the parties had an open account as a matter of law, and that the limitations period had not run. *Id.* at 377–78. Specifically, the Fifth Circuit stated in its opinion as follows:

Sunshine argues that the account was an open account because Dolgencorp submitted purchase orders that Sunshine subsequently split into separate invoices based on where Dolgencorp required Sunshine to ship the products. Payment for the invoices was due thirty days after they were issued. Dolgencorp did not pay invoices separately; rather it submitted payments to Sunshine based on the initial purchase orders, so a number of invoices would be satisfied through a single purchase order payment. These purchase orders were paid after delivery. Even after delivery and payment in full, Dolgencorp had the opportunity to "charge back" a portion of the invoiced price if it later determined that the jeans did not meet its specifications. The charge back was not an automatic debit; instead, Dolgencorp would subtract the amount from a payment on a subsequent purchase order. Sunshine then had the opportunity

to present evidence to Dolgencorp that the jeans were within Dolgencorp's specifications. If Dolgencorp accepted this refutation, it would credit the amount to Sunshine on a future purchase order payment.

Invoices 334 and 335 were initially paid in full, but the disputed portions were charged back due to "incorrect carton info[rmation]." Dolgencorp subtracted the disputed amount from its next payment to Sunshine on later purchase orders. Dolgencorp did not accept Sunshine's refutation, and the charged back amount remains unpaid.

The account between Sunshine and Dolgencorp was an open account because it allowed for crediting and debiting through multiple transactions, extending over a period of time. The account facilitated the on-going business relationship between the two companies by allowing delivery before payment, charge backs for one purchase to be debited from future payments for another purchase order, and the ability to refute the charge backs and have the amount credited in a future payment. Because it is an open account, the statute of limitations did not begin to run until the parties ceased doing business....

*Id.*

In the instant case, the parties agree that Innovative is a third party beneficiary of the Master Program Agreement that BOA executed with Sharp. The evidence shows that Innovative procured the customers, installed the equipment, trained the customers, and provided service and maintenance on the equipment. Innovative provided all the replacement parts and maintenance items such as replacement toner cartridges for the equipment. It also collected meter readings and faxed them to BOA, which in turn determined

how much BOA was required to pay Innovative for any given month. Essentially, Innovative was the local representative for Sharp. It is true that, with the exception of the meter readings, it did not provide goods or services directly to BOA. But we have held that goods or services need not be provided for an open account to exist. Therefore, Innovative was not required to provide goods or services directly to BOA, so long as they had transactions between them that created a creditor-debtor relationship through their general course of dealing.

The customers paid BOA based on Innovative's work. BOA obtained financial benefits through Innovative's work in these multiparty transactions. BOA was required to pay Innovative based on the installation report, the monthly base charges, and any overages shown by Innovative's meter readings. The monthly base charge and meter readings determined BOA's compensation, and consequently, Innovative's compensation. Innovative accounted for its work through its invoices and continued working, even though it had not received payment for the work it performed on particular photocopiers.

According to the SNAP contracts, BOA was required to pay Innovative when it received the meter readings, regardless of whether BOA had been paid or not. However, there was often a delay by the customers in reporting their meter readings. In addition, when BOA sent a check and a remittance report identifying the serviced printers, the remittance report itemized helpful information, but did not show the time period that payment covered on a particular photocopier. Consequently, it was not clear what work the check covered each month when the information from BOA was compared to Innovative's invoices. Moreover, there was testimony

that BOA did not pay Innovative until BOA got paid, although it is not entirely clear whether that was true. Nevertheless, Innovative contends that much of the work it completed for which it was entitled to compensation went unpaid. Innovative knew this because Christy Young tracked all of the work Innovative did on every photocopier. Thus, through their transactions and course of dealing, a creditor-debtor relationship was created, whereby BOA owed Innovative money for the work it performed.

With regard to the third element, in *Eaves*, the court explains what it means for the parties to expect further dealings.

We further find that the account was still open with the expectation of further dealing. Eaves contends that those elements are not met [because Citibank] does not currently hold an open account for him, and that there was no expectation that Citibank would ever loan him a dime. At its core, Eaves' argument would force creditors to keep credit available to nonpaying debtors and allow those debtors to continue debiting their accounts after having defaulted. We decline to accept Eaves' argument.

. . . .

Once a debtor defaults on his account, although the debtor may not be able to withdraw on the account, his obligation to pay still remains. Here, although Eaves defaulted on his account with Citibank, he still maintained his obligation to pay the debt; therefore, the account was still open with the expectation of further dealings, that is, that Eaves would tender the amount owed.

*Eaves*, 301 S.W.3d at 409. BOA contends that because the agreement was for a specific term, i.e. a twelve month period with an automatic renewal absent timely notice for termination, their dealings would terminate on a specific date, and they could not *expect* further dealings. We disagree. The term of the agreement automatically renewed, and the parties operated under the SNAP contracts for several years. Since the parties continued their relationship despite their differences, they had the expectation of future dealings under the SNAP program, irrespective of the time period that the SNAP contracts were continued. That is, of course, until they severed their relationship after their failed attempts to resolve this ongoing dispute. This does not mean, however, that BOA is not obligated to pay Innovative in accordance with the SNAP contracts; the expectation is that BOA will tender the amount owed. Consequently, the parties had the expectation of further dealings until the account was resolved.

With regard to the final element, the open term element, the court in *Conti* notes that "[a] credit card debt may be considered an open account because, under a credit card agreement, the terms of repayment remain subject to modification, and the parties exchange credits and debits until either party settles the balance and closes the account." *Conti*, 345 S.W.3d at 491–92 (citing *Eaves*, 301 S.W.3d at 409). The issue here is not whether payment was made, but rather, whether this was an open account. The terms for payment were flexible and often undetermined. As we have already mentioned, payment was dependent on the meter readings, which were often delayed by customers. Payments were made to Innovative on several different photocopiers each month in a single check covering unknown periods of time based on the remittance reports. The amounts paid to Innovative varied widely each month, presumably in part due to the ebb and flow of meter reports. In addition, as we have likewise noted, Sharp could modify payment schedules in order to obtain competitive bids,

and could negotiate special rates so that dealers such as Innovative might not necessarily be paid in strict accordance with the contract.

Moreover, as in *Sunshine Traders*, BOA had the right to assess "charge backs" in which it could debit amounts owed to Innovative on future checks if a given rental agreement was cancelled, terminated, or modified by a customer, BOA, or Sharp.[9] For example, if the customer failed to pay its invoice, BOA was required to notify Innovative to stop performing work and could withhold payment to Innovative until the customer made its account current. In the event that payment had already been made to Innovative, BOA could issue a "charge back" on a future payment to offset amounts owed in the future. If a customer added or removed equipment, a new agreement was made and the rates and terms of the individual contracts were modified accordingly. These changes could also result in charge backs. Since Innovative could be required to receive reduced compensation in unknown amounts from unknown accounts at unknown times, and since BOA could "charge back" items to future payments, we hold that the payment term was "open."

In summary, Innovative has shown, as a matter of law, that its transactions with BOA created a creditor-debtor relationship through the general course of dealing, that the account is still open with the expectation of future dealings (payment by BOA), and that at least the payment term was open. Therefore, we hold that Innovative established an open account under Section 16.004(c) as a matter of law.

### Conclusion

Because the applicability of Section 16.004(c) is the overarching issue in this case, and that section applies only to an open account, we have addressed whether Innovative established an open account as a matter of law. For the same reasons, we have not addressed BOA's arguments that it established a special contract of a matter of law and that a special account and an open account are mutually exclusive. We have held that an open account does not require a sale and delivery of goods or services, passage of title, or payment directly between BOA and Innovative. And we have not decided whether an open term is an element of an open account because Innovative established, as a matter of law, that the payment term was open. We have also concluded that Innovative established an open account under Section 16.004(c) as a matter of law. Accordingly, we overrule the portions of BOA's first issue in which it contended that the terms of the contracts governing the parties' relationship were fixed and certain and negate the essential elements of an open account.

### SUBMISSION OF QUESTION OF LAW TO THE JURY

As part of its first issue, BOA argues that whether the relationship created an open account or special contract is a question of law, and that it was error to submit the issue to the jury.

### Standard of Review and Applicable Law

 An appellate court generally reviews allegations of error in the jury charge under an abuse of discretion standard. Tex.R. Civ. P. 277; *Howell Crude Oil Co. v. Donna Refinery Partners*, 928 S.W.2d 100, 110 (Tex.App.-Houston [14th Dist.] 1996, writ denied). A trial court commits error if it submits a question of law to the jury. *See Knutson v. Ripson,*

---

9. Also, as in *Sunshine Traders*, Innovative could also dispute any charge backs made on the account under the SNAP contracts.

163 Tex. 312, 354 S.W.2d 575, 576 (1962); *Hudson Buick, Pontiac, GMC Truck Co. v. Gooch,* 7 S.W.3d 191, 195 (Tex.App.-Tyler 1999, pet. denied).

 Error in the jury charge is reversible if, viewed in light of all of the circumstances, it amounts to such a denial of the rights of the complaining party as was probably calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1); *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex.2001). Absent a showing of extraneous prejudice, however, submission of a question of law to the jury is generally harmless since no harm results if it is answered as the trial court should have answered it, or it can be deemed immaterial and disregarded by the trial court if answered incorrectly. TEX.R.APP. P. 44.1(a)(1); *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994); *Gooch,* 7 S.W.3d at 195.

 Also, regardless of whether the issue is ordinarily a question of law or fact, if the issue is established as a matter of law, there is no harm on appeal when the trial court charged the jury on the issue, the jury answered it correctly, and the trial court's judgment reflects the correct finding. *See XCO Production Co. v. Jamison,* 194 S.W.3d 622, 632 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (holding trial court's error in submitting issue that was established as a matter of law was harmless because jury reached correct answer that trial court should have found); *El Paso Refining, Inc. v. Scurlock Permian Corp.,* 77 S.W.3d 374, 386 (Tex.App.-El Paso 2002, pet. denied) (holding error in submitting standing issue to jury was

harmless because plaintiff did not have standing as a matter of law to sue defendant, jury found defendant not liable to plaintiff, and therefore that "the trial court's judgment worked the proper legal result"); *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 628 (Tex. App.-San Antonio 1996, writ denied) (same).

### Discussion

 We have concluded that Innovative established the elements of an open account under Section 16.004(c) as a matter of law. Therefore, the trial court erred in submitting the issue to the jury. *See Bank of Tex. v. VR Elec., Inc.,* 276 S.W.3d 671, 677 (Tex.App.-Houston [1st Dist.] 2008, pet. denied). Nonetheless, the jury answered as the trial court should have, and the trial court's judgment correctly reflects the open account finding. *See XCO Prod. Co.,* 194 S.W.3d at 632; *El Paso Refining,* 77 S.W.3d at 386. Consequently, BOA cannot show extraneous prejudice from the trial court's error. *See Spencer,* 876 S.W.2d at 157; *Gooch,* 7 S.W.3d at 195. This renders the error harmless.[10] Accordingly, we overrule the portion of BOA's first issue pertaining to the submission of this issue to the jury. *See id.*

### ATTORNEY'S FEES

In its second issue, BOA challenges the trial court's award of attorney's fees.

### Standard of Review

 While we review the trial court's decision to grant or deny fees under an abuse of discretion standard, we review the amount that the jury awarded

---

10. During the hearing on BOA's motion for directed verdict, the trial court stated on the record its belief that, in relevant part, the parties' transactions created an open account. Also, another judge heard and denied BOA's motion for summary judgment on the same ground. Therefore, we have confidence that the ruling would have been the same, regardless of whether the trial court or the jury resolved this issue.

under a legal sufficiency standard. *See Bocquet v. Herring*, 972 S.W.2d 19, 22 (Tex.1998). The amount of attorney's fees is a question of fact for the jury, but the trial or appellate court has the duty to reduce the fee awarded if it is excessive. *Southland Life Ins. Co. v. Norton*, 5 S.W.2d 767, 769 (Tex. Comm'n App.1928, holding approved); *see also Argonaut Ins. Co. v. ABC Steel Products Co.*, 582 S.W.2d 883, 889 (Tex.Civ.App.-Texarkana 1979, writ ref'd n.r.e.). In determining whether the award is excessive, the reviewing court is entitled to "look to the entire record ..., and to view the matter in the light of the testimony, the record before them, the amount in controversy, and their own common knowledge and experience as lawyers and judges." *Id.*

### Applicable Law and Discussion

BOA argues that unnecessary fees were incurred during the trial and that the amount of fees awarded does not bear a reasonable relationship to the amount of damages.

#### 1. Unnecessary Fees

First, BOA argues that had the trial court granted its motion for summary judgment, the litigation would have been less protracted, and lower fees would have been incurred. Second, in a related argument, BOA points out that the trial court, in denying the motion for summary judgment, raised the possibility of an immediate interlocutory appeal of the issue. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(d) (West 2008) (allowing trial court to issue order permitting interlocutory appeal on otherwise unappealable order if order appealed from involves controlling question of law as to which there is substantial ground for difference of opinion and immediate appeal may materially advance ultimate termination of litigation). BOA implicitly argues that had Innovative agreed to this procedure, the case would have been resolved more quickly, thereby resulting in lower attorney's fees.

▮ BOA has cited no authority suggesting that in reviewing an award of attorney's fees, we should speculate about how particular trial court rulings affected attorney's fees. Nor does BOA cite any authority for the proposition that we should speculate about whether another trial strategy would have resulted in lower attorney's fees. And we are not aware of any such authority. Instead, we are guided by *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex. 1997).

Among other things, the supreme court in *Arthur Andersen* held that attorney's fees cannot simply be awarded as a percentage of the amount of damages due to the existence of a contingency fee contract, and that the factfinder must consider several factors as to whether the fees were reasonable and necessary. *See id.* at 818–19. In so holding, the court stated that "because the jury is not informed what the total amount of the judgment will be, the jury can only speculate about whether a percentage of that unknown recovery will represent a reasonable and necessary fee in that particular case." *Id.* at 819. "Rather than leave this question to speculation, the jury must decide the question of attorney's fees specifically *in light of the work performed in the very case for which the fee is sought.*" *Id.* (emphasis added). *Arthur Andersen* dealt particularly with contingent fee contracts, and Innovative's counsel testified that he had a contingency contract with his client. Therefore, we conclude the principle quoted above is applicable here. It is logical that we need not consider how hypothetical events might have affected attorney's fees. The reality is that the factfinder was presented with the actual scenario when it made its

award of fees. We will not disturb that discretion on appeal based on hypothetical events that could have, but did not, take place.

## 2. Disproportionate Fees

BOA contends that since the amount of damages should be reduced because most of Innovative's claims are barred by the statute of limitations, the award of attorney's fees is disproportionate to the amount of damages recovered. We have already held that the statute of limitations does not bar any of Innovative's claims. Thus, the amount of damages awarded was $43,320.91, and the trial court ultimately reduced the jury's award of attorney's fees to $38,430.24.

■ It is true that attorney's fees must bear some reasonable relationship to the amount in controversy. *Cordova v. Sw. Bell Yellow Pages, Inc.,* 148 S.W.3d 441, 448 (Tex.App.-El Paso 2004, no pet.). But the amount of damages awarded is but one factor in determining the reasonableness of a fee award. *Id.* Moreover, even fee awards with great disparity have been upheld as reasonable. *See Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785 (Tex.1988) (affirming attorney's fees of $12,570.00 in a contract suit with $2,920.00 in damages); *Rio Grande Valley Gas Co. v. City of Edinburg* 59 S.W.3d 199, 224 (Tex.App.-Corpus Christi 2000, no pet.) (affirming an award of $2.9 million in attorney's fees on a $584,517.26 damage award); *Murrco Agency, Inc. v. Ryan,* 800 S.W.2d 600, 606 (Tex.App.-Dallas 1990, no writ) (affirming $92,000.00 in attorney's fees for a $28,000.00 damage award); *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 626 (Tex.App.-Dallas 1987, writ denied) (affirming a $160,000.00 attorney's fee award on a $24,067.14 damage award).

■ Here, the amount of damages exceeded the fee award. Moreover, the clerk's record consists of over 900 pages, including a motion for summary judgment and an amended motion for summary judgment, depositions, and other discovery. After a hearing, the trial court denied the motion for summary judgment, and the parties went to trial. The trial included two days of testimony, and part of a third day for argument and deliberations. The parties offered extensive documentary evidence relating to multiparty complex commercial transactions that occurred over a period of several years. And the parties strongly disagreed on the precise structure and nature of their obligations under the contract. Therefore, we cannot say, on the record before us, that the attorney's fee award was disproportionate.

## 3. Holding

Based upon our review of the record and applicable law, we hold that BOA failed to show that the award of fees was erroneous or was disproportionate to the damages award. Accordingly, BOA's second issue is overruled.

### DEFINITION OF "SPECIAL CONTRACT"

In its third issue, BOA argues that the trial court erroneously defined "special contract" in the jury charge, which resulted in an improper verdict. Because we have held that Innovative established an open account as a matter of law, we need not address this issue. *See* TEX.R.APP. P. 47.1.

### DISPOSITION

We have not addressed the portions of BOA's first issue it established a special contract as a matter of law and that a special account and an open account are mutually exclusive. We have overruled the remaining portions of BOA's first issue

as well as its second issue, and determined that we need not address its third issue. Having done so, we **affirm** the judgment of the trial court.

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, AD-JUDGED and DECREED that the judgment of the court below be in all things affirmed, and that all costs of this appeal are hereby adjudged against the appellants, **BANK OF AMERICA, FLEET BANK d/b/a FLEET LEASING, BANK OF AMERICA CORPORATION, AND FLEETBOSTON FINANCIAL CORPORATION d/b/a FLEET LEASING AND NATIONAL BANK,** for which execution may issue, and that this decision be certified to the court below for observance.